EXECUTORS OF JOSEPH BURR *vs.* RICHARD SMITH *et al.*

(*In Chancery.*)

Courts of chancery had jurisdiction of bequests to charitable uses, before the statute of 43d Elizabeth, by virtue of their equity jurisdiction.

The law, as now established, in relation to gifts, &c. and to charitable uses, is not derived from that statute, but existed anterior. ·

A gift to a charitable use, may be decreed, notwithstanding the objects are vague and indefinite, and notwithstanding the persons who are to carry into effect the intent of the testator, are a society unincorporated;—thus a gift to the treasurer for the time being of the American Bible Society, &c., held to be good.

*Quere.*—Whether the 41st section of the constitution of this state does not render all societies for the advancement of religion and learning, and for other pious and charitable purposes, capable of receiving gifts, and holding property without incorporation.

This was a bill in chancery, exhibited by the executors of the will of Joseph Burr, late of Manchester, in the county of Bennington, and state of Vermont, who died leaving no issue, against Moses Allen, John Adams, Richard Smith, Knowles Taylor, Samuel Hickok, James D. Butler, treasurers of the several societies named in the bill, and Hannah Treadway, Daniel Kissam and Peggy C. Kissam, wife of said Daniel, James T. Burr, Peggy Burr, Mary Burr, Sarah Burr, residuary legatees of the will of Joseph Burr, deceased, setting forth the organization of several charitable associations, to wit: The American Bible Society, The American Colonization Society, The American Tract Society, The American Home Missionary Society, and The Vermont Domestic Missionary Society. The following extract shows the general form of the descriptions given to these different societies :

That Samuel Spring and Jedediah Morse, of the Commonwealth of Massachusetts, Lyman Beecher and Nathaniel W. Taylor, of the State of Connecticut, John Meacham, Philip Milldoler, Gardner Spring, Orrin Day, and Eliphalet Nott, of the State of New York, Joshua M. Wallace and Thomas I. Briggs, of the State of New Jersey, and John H. Rice, of the State of Virginia, and divers other persons residing in different parts of the United States, many of whose names are unknown to your orators, being convened in the city of New-York, in the county and state of New-York, on the eleventh day of May, in the year of our Lord one thousand eight hundred and sixteen, formed themselves into a voluntary association or society, by the name of The American Bible Society, for

31

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
the purpose of encouraging and promoting a wider circulation of the Holy Scriptures, without note or comment throughout the United States and their territories, and also in other countries, whether Christian, Mahometan or Pagan, framed and adopted a constitution, setting forth the object of said society or association, the terms on which members might be admitted into said society, and the means or organs of conducting its operations, and therein providing also that the officers of said society should be a President, Vice President, Treasurer, Secretaries, and a Board of Managers;—that the said society, at the same time, organized by electing divers persons to fill the said offices of President, Vice President, Treasurer, Secretaries and Managers thereof, and hath every year since that time to the present, at annual meetings of said society, continued to fill, and hath kept full the said offices, for the purpose of conducting the business and promoting the aforesaid objects of the said society or association, by appointing divers persons to fill said offices;—that at the time of the formation of said society and since, many thousand persons, residing in different parts of the United States and their territories, have united themselves with, and become members of said society, and have paid thereto several hundred thousand dollars to be expended in prosecuting the aforesaid objects of said society, and that ever since the aforesaid formation of the said society, the existence thereof under the name aforesaid, the objects and operations thereof, and the existence of the aforesaid officers thereof, have been, as your orators verily believe, extensively and generally known throughout the United States.

The bill then sets forth as follows:

And your orators further show unto your honors, that Joseph Burr, of Manchester, in the county of Bennington, and state of Vermont, at said Manchester, on the fourth day of April, A. D. 1828, the said Joseph then well knowing and understanding the existence of each and every of the aforesaid associations and societies, and the objects and purposes of each and every of them, and that each and every of said societies for the promotion and execution of the purposes and business thereof, had such officers as hath herein before been set forth, made, executed and published his last will and testament, in which said will, the said Joseph did, among other things, bequeath as follows, to wit:

"I give and bequeath to the Treasurer, for the time being, of the American Bible Society, formed in New-York, in the year 1816, for the use and purposes of the said society, eighty-four shares of

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

stock in the Union Bank in the city of New-York, belonging to me, valued at four thousand two hundred dollars—also eighty shares of stock in the City Bank, in the city of New-York, belonging to me, valued at four thousand dollars—also ten shares of stock in the Bank of America, in the city of New-York, belonging to me, valued at one thousand dollars—also the sum of five thousand eight hundred dollars in cash, to be paid by my executors to the said Treasurer in five annual instalments, next after my decease, they taking receipts for the same.

"I give and bequeath to the Treasurer, for the time being, of the American Home Missionary Society, formed in New-York in the year 1826, the sum of ten thousand dollars, for the use and purposes of said society, and I do hereby direct my executors to pay said sum of money to the treasurer of said society, in five annual instalments, next after my decease, taking receipts for the same."

The bequest to to the other societies were in similar form.

The bill further states—

And that said Joseph, after making in his said will, divers other bequests and devises of lands, tenements, goods and chattels, and sums of money, to divers other religious, charitable and literary institutions, societies and corporations, and to divers other individuals, did in and by his said will, give and bequeath the rest and residue of his estate to James T. Burr, Peggy Burr, Mary Burr, and Sarah Burr, of the city of New-York, Hannah Treadwell, and Peggy C. Kissam, wife of Daniel Kissam of North Hampstead, and George Burr of Lansingburgh, all in the state of New-York, by a clause in the said will contained, of the tenor following, to wit:

"As to the rest and residue of my estate, after the payment of all my just debts, and all legacies specified in this my last will, the expenses of settling my estate, and a reasonable compensation for my executors for a faithful discharge of the trust imposed on them, I give and bequeath the same to Hannah Treadwell and Peggy C. Kissam, children of my deceased sister, Susannah, James T. Burr, Peggy Burr, Mary Burr, and Sarah Burr, children of my brother Isaac Burr, and to George Burr, son of my brother Jonathan Burr, in equal proportions."

The bill then sets forth the death of Mr. Burr, the exhibition, proof and allowance of the will by the court of probate, the appeal to the supreme court, taken by the residuary legatees, who were the heirs and representatives at law of the testator, their neglect to

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

carry up said appeal, the entry thereof by the executors, and the affirmance by the supreme court of the decree of the court of probate.

In describing the treasurers of the several societies, the bill sets forth that John Adams, of the city, county and state of New-York, was elected and appointed sole treasurer of the aforesaid society, known by the name of "The American Bible Society," on the first day of November, A. D. one thousand eight hundred and twenty-seven, and did then and there take upon himself said office ; and as your orators are informed and verily believe, ever since, hath ever since held and sustained the said office, and performed the duties thereof, and still doth hold and sustain said office and perform the duties thereof, and ever since hath been and still is generally known as the treasurer of said society.

And your orators further show unto your honors, that Richard Smith, of the city of Washington, in the District of Columbia, was, on the first day of January, A. D. one thousand eight hundred and twenty-eight, and before the making of said will, elected and appointed by the aforesaid society, known by the name of "The American Colonization Society," treasurer of said society, and did then and there take upon himself said office, and hath ever since and still doth, as your orators are informed and verily believe, held and sustained the same office by repeated elections thereto, and ever since hath performed, and still doth perform the duties thereof, and ever since hath been, and still is generaly known as such treasurer.

A similar description is given of the treasurers of the other societies.

The bill then states the demands made upon the executors for the legacies by the treasurers of the different societies, and also by the residuary legatees, and a notice from them that they should claim all the sums of money bequeathed to the societies named in the will, the readiness of the executors to pay all the legatees when the rights of the respective claimants should be fairly adjusted by the decision of some court of competent jurisdiction, having power to protect them in the premises, their refusal to pay before said adjustment, their offer to pay the money into court, and their prayer that the parties may interplead so that their rights and claims may be adjusted among themselves, and the willingness of the executors to pay the money to such of them to whom it shall appear to belong.

BENNINGTON,
February,
1835.
Ex'rs of. Burr
vs.
Smith et al.

The separate answers of the several treasurers of the societies were nearly the same in expression and, substance, and admitted the facts set forth in the orators' bill, stating that they were, and still are treasurers of their respective societies, and as such, claim the legacies in the will to be decreed them for the uses and purposes of said societies, and denying the claims of the residuary legatees.

The answer of the residuary legatees admits the facts stated in the bill, but denies the claims of the societies, and demands the money bequeathed said societies as belonging to themselves.

*G. Wood for the special legatees.*—The question to be determined is, whether the bequests in the will are or are not good and valid bequests to charitable uses.

Charities are distinguished into two kinds, viz: general charities, and charities with a fixed and definite purpose, having a scheme to administer the charity. In both cases the *cestui que* trusts or objects of the charitable bounty are generally uncertain, and are to be-sought out and relieved.

In the latter, the character or class of objects to be relieved is designated, and the mode of relief prescribed. In the former, the mode of administering the relief, and the class of objects to be relieved, are to be established.

They are also divided into charities with a charter of incorporation to administer them, and charities at large.

In the former case, the founder is the visiter of the charity, or if he waives the right of visitation, or the charity is founded by the sovereign, the sovereign is the visitor.

In the case of general charities, they are established by the king, and in the case of charities founded by charter, where he is visitor, they are visited by him, not in *person*, but by delegation under the sign manual. Their powers, as well of establishment as of visitation, are *judicial*, and when delegated to the chancellor, he exercises a special, summary, delegated, judicial power, distinct from his general *equity* in common law jurisdiction, like the special delegated power exercised by him in establishing a case of idiocy or lunacy.

The king exercises, through his delegate, this summary and extraordinary judicial power, in virtue of his prerogative as *parens patriæ*, or protector of the people.

In addition to this, he will, as *parens patriæ*, enforce public rights, and rights partaking of a public character, as charities, in the different

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al. courts of justice, under their general jurisdiction. For that purpose, his attorney general will exhibit an information.

In the case of charities with a scheme and definite purpose, where it is necessary to make the attorney general a party, as where the trustee abuses his trust, or a new trustee is to be appointed, or where the managers of the charity violate their duties and are to be called to an account, the attorney general will exhibit an information in chancery for the purpose, which is conducted under the general equity jurisdiction of the chancellor.

When there are visitors of a charity founded by charter, if they are trustees of the charity and abuse their trust, they are called to account by bill or information, as the case may require, under the general equity jurisdiction of the chancellor.

Whether a charity is administered by one or more individuals, or by a corporation, or by a voluntary association, and either according to some settled plan, or with more or less latitude of discretion, *they* are not the *cestui que* trusts. They are, to use the language of chancellor Jones in 9 Cowan, 465, only the almoners to dispense the bounty.

The doctrine of charitable uses had its origin in the civil law. Hence it spread through the different countries of modern Europe.

In Domat's Civil Law, vol. 2, pp. 168, 169, 170, (book iv. § vii) are the following passages: "Legacies to pious uses are those legacies that are destined to some work of charity, whether they relate to spiritual or temporal concerns. Thus a legacy of ornaments for a church, a legacy for the maintenance of a clergyman to instruct poor children, and a legacy for their sustenance, are legacies to pious uses."

"We may make this a just difference between legacies to pious uses and the other sorts of legacies, that the name of legacies to pious uses is properly given only to those legacies which are destined to some work of piety and charity, and which have their motives independent of the consideration which the merit of the legatees might procure them; whereas the other legacies have their motives confined to the consideration of some particular person, or are destined to some other use than to a work of piety or charity."

"All legacies which have not for their motive the particular consideration of some person, are not for all that of the number of legacies to pious uses, although they be destined for a public good, if that good be any other than a work of piety or charity. Thus a legacy destined for some puplic ornament, such as the gate of a city, for the embellishment or conveniency of some public place,

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

and others of the like nature, or a legacy of a prize to be given to some person who should excel others in some art or science, would be legacies of another nature than those to pious uses."

" If a pious legacy were destined to some use which could not have its effect, as if a testator had left a legacy for building a church for a parish, or an apartment in an hospital ; and it happened either that before his death the said church or said apartment had been built out of some other fund, or that it was no ways necessary or useful, the legacy would not for all that remain without any use, but it would be laid out on other works of piety for that parish, or for that hospital, according to the directions that should be given in this matter by the persons to whom this function should belong."

" Since legacies for works of piety and charity have a double favor, both that of their motive for holy and pious uses, and that of their utility for the public good, they are considered as being privileged in the intention of the law."

We here see the elements of the law of charitable uses, as administered in the English court of chancery.

I propose to establish the following propositions :

1. That the doctrine of charitable uses was borrowed from the civil law, and incorporated into the law of England, long prior to the 39th or 43d of Elizabeth, and was recognized, though not enforced in the common law courts.

2. That these equitable rights, which are distinct from the legal estate, were, prior to the said statutes, enforced and protected by the chancellor, under his *general equity jurisdiction*.

It would be singular, if it were otherwise. Practical charity is an essential part of Christianity. Charitable institutions, more or less permanent, as the case may require, are constantly springing up in every Christian country. The practical exercise of charity as a constant spring of action, distinguishes the Christian world from the Pagan. The protection and enforcement of its rights and its duties by law, distinguishes Christian governments from Pagan governments.

These charitable institutions are in their nature vague and indefinite. The objects of charitable bounty, on an extended scale, are to be sought out, and cannot be certain like ordinary *cestui que* trusts.

A vast mass of property will and must, in every Christian community, exist in this form. The question is, should it be protected by law or placed beyond the pale of the law ?

If the almoners of the charity are incorporated, this does not

Bennington,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.
dispense with the necessity of a court of equity to protect the charity and the due administration of it; otherwise the members of a corporation might with impunity misappropriate it, or even divide it among themselves.

This doctrine was introduced into England from the civil law. *White* vs. *White*, 1 Bro. Chan. Cas. 12, 15.  2 Kent's Com. sec. 33.  3 Peters. 481–2.  The testament to pious uses is not void in respect of uncertainty as other testaments are.—Godolphin, part 1, chap. 5, sec. 4, p. 17.  If a testator give the residue of his goods to the poor, this disposition is not void by reason of uncertainty, for that is a testament, *ad pias causas.*—Swinb. part 7, § 8, p. 909.

In Porter's case, (1 Co. K. 24) charitable uses are recognized as good and valid dispositions.   See Sanders on Uses, 62.

(6 Co. K. 2) The lord purchases part of the land charged with services for the advancement of religion—the entire services remain, though it would be otherwise in other cases.

*Gibbons* vs. *Martinoke*, Popham, 6, 7, 8.  *Martindale* vs. *Martin*, Cro. Eliz. 288.   In 4 Reeve's Eng. Law, 551, it is stated to have been the duty of the ordinary to distribute a portion of the estate of the deceased to charitable uses.   When thus distributed, the disposition must have been considered valid at law.

The statute of 43d Elizabeth could not have been otherwise than declaratory in enumerating charities, for it contains an enumeration of only thirteen, and justice Baldwin has collected a much larger number as declared by previous statutes and previous authorities, embracing all those enumerated in that statute.

*Magil* vs. *Brown*, in the circuit court for the district of Pennsylvania, on the will of Sarah Zane, pp. 54, 55.

In *Bendlowe's* case, cited in 4 Coke, 24, it was decided that a feoffment to the use of *poor people* was not within the act of 23 H. 8.

The object of these various statutes appears to have been to define charities, in order to distinguish what was good from what was superstitious, in order to prohibit the latter.   Hence courts have never been confined to the cases enumerated, but they have protected analogous cases as good charitable uses.

In the *Attorney General* vs. *Combe*, the statute of 43 Eliz. took pattern from 1 Eliz. 6, made to take away superstition.   Hence when any difficulty has since arisen about charitable dispositions, the inquiry has been, not whether they were embraced within the statute of Elizabeth, but whether they were analogous in principle.

The vast mass of charity cases enforced since the statute of 43d Elizabeth never could have been satisfied upon any other construction of that statute.

BENNINGTON,
*February,*
1835.
Ex'rs of Burr
vs.
Smith et al.

The act authorizes the commissioners to inquire after and redress *abuses* and *frauds,* &c. How could there be *abuses and frauds* upon property dedicated to charitable uses, if they were not recognized by the laws of the land?

2. These charitable uses were protected by the chancellor, prior to the statute of 43d Elizabeth, under his general equity jurisdiction.

Doubts have been cast upon this subject by the dicta of Lord Loughborough, in 3d Vesey, 726, and of chief justice Marshall in the case of the *Baptist Association* vs. *Hart's Executors,* in 4 Wheaton's Reports.

Lord Loughborough remarks, that prior to the time of Lord Ellismire they made out their case as well as they could at law, and he refers to 1 Co. 16, and 10 Co. 1, to show that the doctrine of charitable uses was recognized in the common law courts. Of course then he was of opinion that charitable uses were valid at *law,* if not in *equity,* prior to the statute of 43d Elizabeth.

His opinion that there was no remedy in equity seems to be adopted by the chief justice in 4 Wheaton, 42; and they both refer to *Porter's* case in confirmation of this opinion.

But there was no remedy whatever at *law* for breach of a charitable use.—Cro. Eliz. 288. In Peters' case the performance of the charitable act was a *condition* and not a *use,* which condition the heir alone could take advantage of, and therefore the proceeding was and could only be at law. A similar effort to recover at law was made in Cro. Eliz. 288, which failed because it was determined to be a use, and not a condition, and therefore not cognizable at law, though the judges expressly decided that such uses were good. The remedy, therefore, for a breach of a charitable use must have been somewhere else.

The chief justice remarks, 4 Wheaton, 35, that in *Porter's* case no question arose concerning the possibility of enforcing the execution of the trust—that it was not forbidden by law, and therefore the trustee might execute it. This is all true of a *condition,* but not of a *trust.* A trust must be *sanctioned* by law as a *trust* to warrant its execution, otherwise the trust fails, as in *Morrice* vs. *The Bishop of Durham,* 9 Vesey, 319. Therefore the inference from *Porter's* case, that these trusts were too vague to be assisted in equity, without the aid of the statute, is not warranted.

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

The chief justice, 4 Wheat. 38, remarks, that we have no trace in any book of an attempt in the court of chancery at any time anterior to the statute to enforce one of these vague bequests to charitable uses.

These bequests are vague, as above shown, from the reason and nature of the thing.

The readings of Sir Francis Moore upon the statute of charitable uses appear to have escaped the attention of the court, as well as of Lord Loughborough. He was the framer of the statute, had read and written extensively on the subject, and may be presumed to know whether the chancellor, under his general equity jurisdiction, did give relief before.

Payne's case in Bridgman's Duke, 156, and Fleming's case, ib. 163, cited from Moore's readings, establish such previous jurisdiction beyond the possibility of doubt.

See also Pember vs. Knighter, and Pensted vs. Reyer, Duke. 381, to the same point, also Hynshaw et al. vs. Morpeth, Corporation, ib. 242.

The chief justice further remarks, 4 Wheat. 36, if charitable trusts, however vague, could then, (that is, before the statute,) as now, have been enforced in chancery, why pass an act to enable the chancellor to appoint commissioners, &c.? If the chancellor could accomplish this, to what purpose pass an act? The reason may be found in the above case of Morpeth, Duke, 242.

The chancellor in that case decided that the commissioners had jurisdiction in that case, otherwise the trustees would go unpunished, unless in chancery, or parliament, which would be a tedious and chargeable suit for poor persons.

The object of the act was, to introduce a new and summary remedy, to avoid the expense and delay of a chancery suit, with an appeal to parliament. Hence it appears that the chancery suit did not grow out of the statute, but the remedy in the statute, was intended to avoid the necessity of resorting to it.

In the Attorney General vs. Matthews 2 Lev. 167, it appears that general charities, not confined to a definite purpose, are not within the statute. The most vague of all charitable bequests are enforced independently of the statute, unquestionably, and cannot be said to have been introduced by it.

A class of cases occurring after the statute of Elizabeth is referred to by the chief justice to support his views upon this subject, viz: Finch, 221, Cas. in Chan. 134, 237, 1 Hob. 136.

These cases prove, that under a liberal construction of appoint-

BENNINGTON,
*February*
1835.

Ex'rs of Burr
*vs*
Smith *et al.*

ments to charitable uses, the statute cured all defective conveyances, and conveyances to corporations were made valid, and the statutes of Mortmain were thereby respected, *pro tanto*. In these respects the statute was not merely declaratory, and being cases arising within the statute, another question arose, whether the relief in those cases was not confined to the summary remedy given by the statute, but it was determined that the chancery might, by *original bill*, relieve in those cases, exclusively within the statute. No fair inference could be drawn from thence, that the statute gave the remedy by original bill, in all other cases in respect to which the statute, so far as it embraced them at all, was merely declaratory.

It is evident that, anterior to the statute of charitable uses, a vast mass of the property of the kingdom had been dedicated to such uses and existed in that form. It could not, as before shown, be protected in courts of law. Chancery was the proper forum to give relief, and did give relief in the case of ordinary uses and trusts. It is a well settled principle, that there is no right without a remedy, if no where else, at least in the appropriate court of general jurisdiction. Chancery was the appropriate court of general jurisdiction.

Lord Macclesfield, in 2 P. Wms. 119, states, that the king has, *pro bono publico*, and independent of the statute, an original right to superintend the care of charities, and before it as well as since, it is every day's practice to file informations *in chancery* in the attorney general's name, for the establishment of charities.

Upon this the chief justice remarks, 4 Wheat. 39, that this is no more than that right of visitation, which is an acknowledged branch of the prerogative, and is certainly not given by statute. These words were offered for the purpose of illustrating the original power of the persons and estates of infants, and not with a view to any legal distinction between a legacy to charitable and other objects.

By this he means to say, that these *vague* trusts, as he calls them in another place, are void as well in the case of charities, as in other cases at *common law*, and not altogether on that statute.

The case above cited from 2 Lev. shows, that these vague or *general* charities are not *within the statute*, but rest on *general* principles and independently of the statute.

The power of the king, as *parens patriæ*, to superintend charities, is something more than his visitorial power, which is confined to corporations, and exists only when there is no other visitor.— *Phillips* vs. *Bury*, 1 Lord Raym. 5 s. c. 2 Ter. 346. *Dartmouth*

BENNINGTON, *College* vs. *Woodward*, 4 Wheat. 674. *Attorney General* vs.
February,    *Earl Clarendon,* 17 Vesey, 498.
1835.

Ex'rs of Burr          The distinction must be attended to between the judicial power
vs.          of the king as *parens patriæ*, delegated usually to the chancellor,
Smith et al.  and his general superintending power, enforced through his attor-
ney general, in courts according to their *general jurisdiction,* and
in which the attorney general appears only as a suitor to enforce
their rights upon general principles of law and settled rules of prac-
tice.

This special summary jurisdiction is exercised by the chancellor,
as a delegation of the crown, in a summary way, in the case of
general charities, visitations of elymosynary corporations, and of
idiots and lunatics.

The proceedings are before the chancellor by petition or com-
mission, under the sign manual, in a summary way.  See *Attor-
ney General* vs. *Herrick,* Amb. 712, and the cases there referred
to.  2 Harrison's Ch. Pr. for proceedings on commission to estab-
lish a case of idiocy or lunacy.

In the *Attorney General* vs. *The Earl of Clarendon,* 17 Ves.
492, an information for the regulation of Harrow School, under
the visitorial power, was dismissed, on the ground that the remedy
was by petition to the crown, and not by bill or information.  But
in *Attorney General* vs. *Dixie,* 13 Vesey, 519, it was held that
an information would lie in the case of an abuse or mismanagement
of the revenues by the members of a charitable corporation, under
the general jurisdiction of the court in cases of *breach of trust,* on
p. 553, the chancellor states, that although a commission of chari-
table uses could not issue in such case, the court may act.  See
also *Dummer* vs. *The Corporation of Chippenham,* 14 Vesey,
252, 2 Mad. Ch. 129.

That the proceedings by information in chancery are under its
general equity jurisdiction, and according to its settled rules of
practice, see 2 Vesey Sen. 327, 328, Mitford's Pleadings, 78, 79.

In ———, 9 Vesey, 547, an application was made to tax
costs in a summary proceeding before the chancellor exercising the
power of visitor, on the ground of its being a proceeding *in equity,*
and therefore within the statute allowing costs.  It was refused,
the proceeding not being *in equity.*  But costs are constantly tax-
ed in proceedings in charity cases, whether by *bill or information.*

It is usual to blend in the case of general charities the equity
jurisdiction of the chancellor upon bill or information with his del-
egated summary jurisdiction by petition under the crown, as in *Ca-*

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al*

*ry* vs. *Abbott*, 7 Vesey, 490, 497, which was by bill, the attorney general being defendant. The same took place in *Attorney General* vs. *Dixie*, 13 Vesey, 535; also in the *Attorney General* vs. *Herrick*, Ambler, 713, and in *Attorney General* vs. *Lyderfin*, 1 Vern. 224.

In such case the charity is defined and settled, as to its purposes, under the sign manual, and a final decree is had upon the bill or information directing the appropriation of the funds, or as the case may be.

These views of the subject will serve to explain the general remarks of treatise writers on the powers of the king as *parens patriæ*, and the powers of the chancellor as his delegate.

In 2 Vern. 342, the chancellor says, there were several things that belonged to the king as *parens patriæ*, and fell under the care and direction of this court as charities, infants, idiots and lunatics. But the chancellor certainly did not mean to say, that in all proceedings touching those interests before the chancellor, he is acting as the special delegate of the crown. He may be so acting on appointment of guardians to wards, and in protecting wards of the court in a summary way. But when bills or informations are exhibited touching any of those interests, the proceedings are under the equity jurisdiction of the court, and costs are taxed as proceedings in equity.

The sovereign, as *parens patriæ*, or guardian of the people in return for their allegiance, will take care of such of his subjects as are unable to take care of themselves, whether it proceed from nonage, idiocy, lunacy or the like.—Chit. Prerog. of the Crown, 158. Standf. Prerog. 37.

When the sovereign sues in courts of justice, he proceeds according to the laws of the land and the practice of the courts.

Thus an information of debt is in effect the king's action of debt.—Chit. Prerog. 335. 3 Bl. Com. 261. *Porter's* case, 1 Co. 24, was an information for intrusion, but it will not be pretended that the judges of the exchequer were then acting under a personal delegation from the crown.

When the United States sue in the federal courts, either on the common law or equity side, they are governed by the same general principles as in other cases.

In the *Attorney General* vs. *The Mayor of Dublin*, 1 Blingh's Rep. 347, 348, (new series,) Lord Redesdale says the king, as *parens patriæ*, has a right to call upon the courts of justice according to the nature of their *several jurisdictions*, to see that right is done to the subject.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

To conclude, upon this branch of the case : The power of giving relief by information is under the general equity jurisdiction of the court, and if this power did exist anterior to the statute of uses, it establishes the original jurisdiction of that court, as a court of equity, over the subject, independently of the statute.   We have shown from Duke the power of the court, anterior to that statute, to give relief by original bill.   The testimony of Lord Eldon to the high authority of that work will be found in 1 Swanston, 298-301.

Lord Eldon, after a full examination of the subject, says, that where there is a general indefinite purpose, not fixing itself upon any object, the disposition is in the king by sign manual, but when the execution of the charity is to be by a trustee with general, or some objects pointed out, the court will take the administration of the trust.—*Moggridge* vs. *Thackrule*, 7 Vesey, 86, 87.

The case of Bradley's will, 7 Vesey, 50, and of *Morrice* vs. *Bishop of Durham*, 9 Vesey, 319, were decided expressly on the ground that the trusts were too extensive to be embraced under the head of charities.   Benevolence, virtue, and the happiness of mankind, may embrace charity, but they embrace something more.

The statute is referred to as a guide to ascertain what is *charitable*.   Not one word is said in either of those cases to show that the remedy, whether by original bill, or information, is derived from the statute.—See his opinion also in 3 Mir. 409, and 6 Dow, 137.

In the *Attorney General* vs. *Mayor of Dublin*, the original jurisdiction of equity over charitable uses came up directly because that statute did not extend to Ireland.   Lord Redesdale decided that chancery had original jurisdiction over charitable uses, which was affirmed on appeal in parliament, Lord Eldon presiding.—1 Bligh's Reports, (new series) 347.

But if we suppose that the equity jurisdiction over charities has arisen since the 43d Elizabeth, it manifestly has not sprung from the provisions of that statute.   The power of the chancellor, under that statute, is special and summary, and altogether different from his general equity jurisdiction.—*Windsor* vs. *Farnham*, Cro. Car. 40. and 2 Atk. 551.   From these cases it appears that neither an appeal nor a bill of review lie from the decree of the chancellor on commission, but an appeal will lie from his decree on original bill in a charity case.

The case of *Morpeth*, in Duke, 242, shows very clearly that the original jurisdiction in chancery is altogether independent of the statute.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

Much the largest portion of equity jurisdiction has arisen since the 43d of Elizabeth. Bills for partition were introduced in the reign of James I.—1 Mad. Ch. 198. The granting of injunctions in chancery commenced about the same time. The first case of a bill *quia timet* was in 20 Charles II.—1 Ch. Ca. 121.

The powers of that court were first fully developed by Nottingham, and afterwards greatly extended by Hardwick.

Its powers to give redress by bill and information in the case of charities, grew out of its general principles of relief, and the analogy which such cases bore to ordinary uses and trusts, the resemblance failing only when from the necessity of the case it must fail, viz. the vagueness of the trust which is essential to the existence and to the salutary administration of public charities. In both kinds there is confidence and trust.

A purchaser of the legal estate, for a valuable consideration, would be protected in chancery.

It is upon the general doctrine of trusts, that a court of equity in the case of charitable corporations, has original jurisdiction to relieve for abuse of management by the governors, (*Holly vs. Rovensworth Hospital*, 15 Vesey, 314,) and even where the heir of the founder being visitor, is one of the governors. (*A. P. Vesey*, 519.) Under the general principle that a trustee cannot buy in the trust estate for his own benefit, the governors of a charity are not allowed to take to themselves leases of the charity lands.—*Attorney General* vs. *Clarendon*, 17 Vesey, 500.

Our last inquiry is, whether the law of charitable use is in force in this country, and will be carried into effect in our courts of equity so far as regards the bequests in this will.

These bequests are for a *definite purpose*. The different associations for whose uses they are given, are organized and in full operation. They form a scheme to administer this charity as definite as the scheme devised by the court, or under its direction in *Moggridge* vs. *Thack*, 7 Vesey, 40. There is no occasion for the interposition of government to direct the establishment of these charities. No schemes are required to be formed. Whether vague general charities, not having a fixed purpose, can be enforced in our courts of equity, it is unnecessary and immaterial to inquire. Whether our courts of equity can be considered as clothed with that special delegated judicial authority which is supposed in England to emanate from the prerogative of the crown, is also immaterial to the present purpose. When those questions fairly arise in a cause, it will be time enough to discuss and decide them.

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

I propose to show,

1st, That these charitable uses, with a fixed definite purpose, are in force in this country, as part of the English common law, sustained and protected in courts of equity, and brought here by our ancestors, and that this position is supported by authorities in this country.

2d, That if this doctrine of charitable uses, and the equitable remedy in relation thereto, is considered as dependent upon the statute of charitable uses, the principles of that statute are in no force here as part of the local common law.

*Terrel* vs. *Taylor*, 9 Cranch, 43, was a bill exhibited by the members of the vestry of an Episcopal Church, on behalf of the congregation, against the overseers of the poor of the county and the wardens of the church, praying that the defendants be enjoined from claiming the land, and the wardens be decreed to sell the land for the benefit of the church.

The lands in question had been conveyed to the vestry in 1770. In 1801, the legislature of Virginia passed an act, vesting this, and all other real estate so held, in the overseers of the poor of the respective counties.

The court decided that the freehold of a church vests in the parson, but for the use of the church ;—that the conveyance passed the premises by estoppel, though the grantees could not hold it for the benefit of the church, (p. 59) ;—that it was immaterial whether the church was or was not a voluntary society ; for in equity, the same reason would exist for relief in the one case as in the other, (p. 45, 46) ;—that the freehold being in the parson, his consent to a sale would be necessary, which was decreed to be made with his assent. The act of 1801 was decreed to be unconstitutional.

The *Town of Pawlet* vs. *Clark and others*, 9 Cranch, 292, was an ejectment for lands in Vermont. The land was granted in the charter of the town of Pawlet, dated 26th August, 1761, by the former Governor of New-Hampshire, to 63 persons, in 68 shares, with a reservation of 5 shares as a glebe for the Church of England, as by law established. Afterwards, in 1802, there was a society of Episcopalians duly organized. The court decided that the legal interest in the share for the glebe was not vested in the other grantees, subject either to a *condition* or *trust* for the church, (p. 324) and that the church as such, was not a corporation ; but its real estate vests in the parson for the use and benefit of the church. There being no such church at the time of the grant, such a donation by the crown for a non-existing parish church, will take

effect as a dedication to pious uses. That this would conform to the doctrine of the civil law, which as to pious donations, Bacton has not scrupled to affirm to be the law of England, (p. 331, 332). These doctrines were determined to have been introduced into New-Hampshire and Vermont, (p. 333).

Bennington,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

In the case of the *Baptist Association* vs. *Hart's Ex'rs*, (4 Wheat. 1) which came up on appeal from the circuit court in Virginia, the court below being divided in opinion, the supreme court decided against the validity of the devise, the association not being incorporated. The land lay in Virginia. The statutes of charitable uses had been introduced into that state as part of their local law, and had been repealed. This of itself might have been sufficient to warrant the decision. But the Chief Justice has delivered an opinion on that case, which, if followed out, would prostrate almost all the property belonging to the religious and charitable operations of the country.

If this voluntary association could not, in equity, take property, as the almoners of a charitable or pious bounty, it follows that a legal estate could not be held in trust for them, whether individuals or a corporation should be the grantees; but there would be either a resulting trust for the donor or his heirs, or the grantees would hold the land, discharged of the trust. This is a familiar principle, applicable to all uses and trusts, and was thereby applied in *Morrice* vs. *the Bishop of Durham*, 9 Vesey, 319.

If that voluntary association, could take an equitable interest for lands for pious and charitable uses, then a court of equity, under another principle as broad as it is familiar, would not allow the equitable interest to fail for the want of a trustee, but would fasten the trust upon the lien at law. The great and well-earned fame of that distinguished Judge, has spread widely the influence of that opinion.

The case of *Beatty* vs. *Kurtz*, (2 Peters. 566) revived the lustre which had been thrown upon the doctrine of pious and charitable uses, in the cases cited from 9 Cranch, and which had been somewhat obscured by the opinion in 4 Wheaton.

A lot of land had been dedicated by Beatty and Richie, in 1769, to pious uses, by being distinguished and set apart, for the sole use and benefit of the German Lutheran Church. Soon after, the lot was enclosed by the society of Lutherans, who used it as a burying-ground, and erected a church. The defendants below, the heirs at law of the original founders, claimed the property. The society were not

33

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

incorporated.   There had been no conveyance to them, or to trus- tees for their use.   The bill was filed by some of the members of the society on behalf of themselves and others, to be quieted in their possession ; and the court decreed in their favor, deciding that if the appropriation is to be deemed valid at all, it must be upon other principles than those which *ordinarily apply between grant- or and grantee*, and that it could be supported as a dedication to public and pious uses, (p. 583).   Though the bill of rights of Ma- ryland was referred to as sanctioning the application of that doc- trine to the case, yet the same court say, in —————— vs. *White*, (6 Peters. 436) *that the court sustained it on the ground that it was a dedication of the lot to public and pious uses*, adopting the principle that had been laid down in the *Town of Pawlet* vs. *Clark*, (9 Cranch, 292) that appropriations of this description were excep- tions to the general rule requiring a grantee ;—that it was like a dedication of a highway to the public ;—that it did not turn upon the bill of rights of Maryland, or the statute of Elizabeth, but rested upon more general principles, and that this was not a novel doc- trine.

There is in this respect a resemblance between charitable uses and public property.   Charities endowed for the relief of certain classes of individuals, are to a certain extent public : they are call- ed *public charities*, though not altogether public property.   Hence, if an information is exhibited on their behalf, a relator is required, (Mitford's Pleading).   The equity right of the voluntary associa- tion of German Lutherans was a public charity, but not public in any other sense ; and certainly not more of a public character than the American Bible Society, or the American Colonization Socie- ty.   We find the same doctrines recognized and sanctioned by the supreme court in *Inglis* vs. *The Trustees of the Sailor's Snug Harbor*, (3 Peters. U. S. R. 99).   These doctrines will be neces- sary to protect the unfortunate sailors, the meritorious objects of that bounty, against the malversations of the trustees, if any should take place.

The Massachusetts dispositions of property to charitable uses, are sanctioned and enforced, (*Bartlet* vs. *King*, 12 Mass. R. 537. *First Parish in Shapleigh* vs. *Gilman*, 13 Mass. R. 190).   In *Bartlet* vs. *King*, the devise was to certain trustees in trust for the American Board of Commissioners for Foreign Missions, and their associates.   The court considered the members of that board, for the time being, as entitled to take as trustees for the charity, there being two sets of trustees.   The court consider trustees as essen-

tial to administer the charity ; and that it cannot be done through
the instrumentality of a scheme formed of a voluntary association,
as was the case in *Beatty* vs. *Kurtz* : But this arose from the cir-
cumstance that they have no *court of equity* in Massachusetts.—
Such an association, therefore, could not sue or be sued in Massa-
chusetts. In a late case (*Going* vs. *Emery*) in the supreme court
of Massachusetts, we find the same principles recognized and ap-
plied.

In *Bull* vs. *Bull*, (8 Con. R.) a bequest for poor relations was
held good as a charitable use. In 2 Vesey, 87, 111, was a simi-
lar bequest, and it was maintained as a good charitable use.

Charitable uses are upheld in New-York, (*McCartee* vs. *The
Orphan Asylum*, 9 Cowan, 479, 481,) in which Chancellor Jones
went into a full and learned investigation of the subject; and he
further maintained, with great strength of reasoning, that if the ad-
ministration of this branch of the law, by the chancellor, is not to
be considered as ordinary equity jurisdiction, yet it formed an an-
cient head of chancery jurisdiction, and the chancellors in this coun-
try are clothed with similar power.—(See also *Bowden* vs. *Mc-
Leod*, 1 Edwards V. Chan. R. 589. 7 John. Ch. R. 292.

In New Jersey, in the case of the *Free Reformed Dutch Church
of Acquackanock* vs. *The Executors of Ackerman*, there was a
bequest of property, the interest to be applied to the maintenance
of a clergyman. The bequest was held to be good, by Chancellor
Williamson, as a charitable use.

In *Shotwell* vs. *Hendrickson*, the same doctrine was maintained
by the court, and was essential to the foundation of the suit.

In Pennsylvania, charitable uses were maintained (in *Whitman*
vs. *Lex*, 17 S. & R. 89, and *McGin* vs. *Aaron*, 1 Penn. R. 51) as
part of the common law of the state. In the case of *Magill and
others* vs. *Brown*, in the U. S. Circuit Court, before Justices Hop-
kinson and Baldwin, on the will of Sarah Zane, containing bequests
to several Quaker Meetings, which were not incorporated, the court
maintained the doctrines of the state courts of Pennsylvania, and
showed that by long established usage in Pennsylvania, religious
and charitable, though mere voluntary associations, were capable of
holding property for pious and charitable uses, and as to such pur-
poses, they were to be deemed incorporated. They further show-
ed, in a very able, learned investigation of the subject, that this
doctrine did not originate in the statute of charitable uses, but was
part of the common law of England, derived from the civil law.—
In North Carolina, in the case of *Griffin* vs. *Graham*, 1 Hawks'

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

BENNINGTON, *February,* 1835.

Ex'rs of Burr *vs.* Smith *et al.*

Reports, 96 and 97, the testator made his executors his trustees, and gave them all the residue of his real and personal estate in trust out of the rents and profits to establish a school for the maintenance of indigent scholars. The heir at law and next of kin exhibited their bill against the executors, in order to have the trusts avoided, and the defendants converted into trustees for themselves. The court decided that the 43d Eliz. was in full force in that state ;— that independently of the statute, their court of equity had the like jurisdiction as the court of chancery in England. That in this case, it was a trust for a definite charity, with specific objects pointed out ; and the court would take jurisdiction thereof, by virtue of its ordinary equity powers.

The case of the *Town of Pawlet* vs. *Clark and others,* in 9 Cranch, came up from Vermont, and is an authority to show that the law of charitable uses exists in this state.—*Stone, Ex'r,* vs. *Griffin,* 3 Vt. R. 400.

I propose next to show, that whether the law of charitable uses in England rests upon the statute of 43d Eliz. or is to be traced to a higher source, its principles have been introduced into this country, and may be maintained and enforced as *local common law.*

The people of this country are a christian people. Charity, both public and private, is, and always has been, widely spread and extensively practised. These remarks apply especially to New-England.

Chancellor Jones, in 9 Cowan, 477, says, "It would be a reproach to the christian character to say, that such charity had its origin in the reign of Queen Elizabeth." Would it not also be a reproach to the christian character of New-England to say that this law of charity has never taken root here ? Wherever a disposition of property of a moral and salutary tendency, has long and extensively prevailed in a community, has become interwoven with the habits, feelings, practices and sentiments of the people, it forms part of their common law. This does not depend on judicial decision, but necessarily precedes it.

The conviction of the existence of such a practice in relation to the matter now under consideration, has often led courts to dispense with the inquiry into the origin of this doctrine ; or if they make the inquiry, also to rest it upon the 43d of Eliz., and then to decide that the principles of that statute have been introduced *here.* Such was the case in *Griffin* vs. *Graham,* 1 Hawks' N. C. R. 96—*Whitman* vs. *Lex,* 17 S. & B, 89, and *Going* vs. *Emery,* lately decided in the supreme court of Massachusetts.

Dane, in the 4th volume of his Abridgement, page 5, says,

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

" The 43d of Elizabeth, in a special manner, made the true distinction in forbidding gifts to superstitious uses, and allowing those to charitable uses;—that the statutes of Mortmain were adopted in New-England, and that the statute of 43d Eliz. was in *principle* adopted by *our ancestors.*" The introduction of these principles into Vermont, does not depend merely upon the general practices, habits and feelings of the community. We find trusts to charitable purposes expressly sanctioned and adopted in the constitution of Vermont. The 41st section provides that all religious societies or bodies of men, that may be united or incorporated for the advancement of religion and learning, and for *other pious and charitable purposes* shall be encouraged and protected in the enjoyment of the privileges, immunities and estates, which they in justice ought to enjoy, under such regulations as the general assembly of this state shall direct.

A vast portion of property in every christian community must exist in this form. It is too late to inquire whether it should be so. The general sentiment and practice of the christian world, have settled that question. This principle, like every other, may be abused. The tendency of the age, however, is against superstitious and extravagant dispositions to charity. There no doubt are cases of indiscretion ; and if they become general, the legislature could apply the correction. It would not be right to place this property beyond the protection of law, to encourage trustees and fundholders to be faithless. The radical error into which judges and counsel have often fallen, consists in supposing that these trusts may *exist* and yet not be *legal.* That they may exist through the intervention of a trustee, and yet not be protected in *themselves* without *his aid.* They must be either lawful or unlawful. If the latter, there can be no trust in their favor : If the former, equity will protect them without a trustee, by fastening a trust upon the *heir ;* or if a trustee abuses his trust, he will be compelled to account, and a new trustee may be appointed.—See Seaton's Forms of Decrees, 128 to 134, 250, 251, and references.

Another radical error arises, from supposing that these vague trusts, as they are called, cannot *support themselves,* and therefore the trustee is considered as clothed with the equitable as well as legal estate ; and of course, if the trust fails, the *whole* fails.

But there is no difficulty in conceiving that property, to be managed for the benefit of necessitous objects, to be sought out and relieved, should be protected in equity, and devoted to its legitimate

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

purposes. That the trustees should account for abuse, and new trustees raised up as in other cases,—that the almoners of the charity should account for their mismanagement, and whenever the abuse is such that there are none to call them to account in behalf of these necessitous objects of the charity, the attorney general should interfere. The practical effect of this system is to protect such property instead of allowing it to be preyed upon.

I propose to show, in the next place, that there are in these cases competent trustees; that if the persons designated as treasurers cannot take under the bequest, the executors are competent trustees to pay over the money to the societies entitled to receive them; and that there are proper parties before the court to render such a decree as is called for by the pleadings and the facts of the case.

The bequest is to the treasurer for the *time being*, &c. This must be construed to be either, first, a bequest to him and his successors in a corporate capacity; second, a bequest to the *person* holding that appointment at the death of the testator, and payable to him in five annual instalments; or third, a bequest to him and those succeeding him in the appointment, until all the instalments are paid.

This cannot be a bequest to the treasurer in a corporate capacity, because he has no such capacity; and the court will not so construe it, if they can put any other construction upon it that will give it effect. The rule is too well established to admit of dispute, that you must so construe an instrument *ut res magis valeat quam pereat.*—*Town of Pawlet* vs. *Clark et al*, Cranch, 328. 12 Mass. 543. Hobart, 123. This may be construed so as to give it effect by considering the word treasurer as descriptive and applying to the person answering that description.—Bac. Abr. Grant C. A devise to the treasurer and was held to be good in *Owen* vs. *Bean*, Bridg. Duke, 486. The same is laid down in *Wellbeloved* vs. *Jones*, Simons and Stewart, 40. In *Waller* vs. *Childs*, Ambler 529, money, the proceeds of sales of real and personal estate, was bequeathed to be paid to the treasurer or treasurers for the time being, for the maintenance of dissenting students for the ministry, the bequest was sustained, and the treasurer not even made a party to the suit. It is no answer to say that it was not intended the treasurer should take a *beneficial interest*. Only a naked legal interest is given to the trustee, whether he was intended to take in his *individual*, or in a supposed corporate capacity. When the bequest or disposition is made to a voluntary asso-

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

ciation, composed of numerous and uncertain persons, constantly changing, it cannot be presumed that it was intended they should take in their individual right. But where the class of persons, though numerous, may be reduced to certainty, they may be construed to take individually. Such is the case in devises to grand children, though numerous, and such was the case in *Bartlett* vs. *King*, 12 Mass. Rep. There is a class of cases where contracts are made by persons as treasurer, clerk, &c. and when the presumption is, that they made them as agents for others, and consequently were not liable. Such cases have no just application to the present case. The court then will have no difficulty in construing this a bequest, not to the treasurer in an official or corporate capacity, but to the *person answering that description.* The expression, *for the time being*, shows it was intended to be descriptive. It would be absurd to intend a bequest to a corporation in perpetuity, and add the expression, *for the time being*. It is, I think, manifest, the testator intended to use the term *treasurer* as *descriptive*, and that he intended one person to take, viz. the person answering that description at *his* death, when the devise takes effect. And for the following reasons:

1. The peculiar language of the will. It is given to the *treasurer* in the singular number, and is made payable to the said treasurer in five annual instalments.

2. This is a passive trust to terminate immediately, and not a continued active trust. It was to go to the uses and purposes of a charitable institution, organized and in full operation. If retained by him afterwards, it would not be in the capacity of *trustee*, but as the mere fund-holder of the society. 1 Sim. and Stew. 40. Amb. 526. In such dispositions the society is entitled at once to receive the money. The expression, *for the time being*, may refer to one particular time, as for instance, the death of the testator, or to a period of time. It was manifestly used in the former sense in 3 Peters, 99, and the word successors embraced the officers succeeding. It was used in the same sense in Amb. 526. But supposing the testator intended that persons successively answering the description of treasurer for five years should take in succession. This would be a shifting use, and being within the period assigned for allowing perpetuities, would be good.—6 T. R. *Daintry* vs. *Daintry*, 307. 1 B. and A. 713. Bro. Ch. Cas. 386. The objection to such dispositions in succession is, the danger of creating perpetuity ; and whenever it runs beyond the limits allowed by the law, if it be a devise of real estate, it is declared *void*. If a

Bennington,
*February,*
1835.
Ex'rs of Burr
*vs.*
Smith *et al.*
bequest of personal estate, the first person takes the whole interest.—Coke Lit. 466. In that view of the case, as this is personal estate, the person answering the description of treasurer at the death of the testator would take the whole legal interest subject to the charitable trust.

But suppose the bequest of the naked legal interest is void, the executors in the will are *trustees.* They take in all cases personal estate in trust for legatees. Executors are chargeable in equity, upon the ground of trust, and are accountable as trustees, each being considered a trustee for the entirety.—Men. Chan. 466–467. *Rutland* vs. *Rutland*, 2 P. Wms. 211. 1 Atkins, 458. 1 Sch. and Le. F. 202. When a legacy is given to one person in trust for others, the executors of the primary trustees, it is a case of double *trust*, in this respect resembling the case *Bartlett* vs. *King*, 12 Mass. Rep. 543. If the legatee named as trustee could take as such, he would at once pay it over to the society. The society is entitled to receive it.—1 Sim. and S. 40. The executor can do the same. But if there had been an entire failure of trustees, if it had been a disposition of real estate, and the trustee named in the will had died in the life-time of the testator, or since, without leaving heirs, or if no trustee should be named in the will, it could not have vitiated or defeated the charitable disposition.

I have already adverted to the error of supposing that these equitable dispositions to charity require an actual trustee in being to support them. If they are too vague to be valid, a trustee will not make them good. If, on the other hand, they are valid, equity will fasten the trust upon the property, in whose hands soever it may be, with the exception of purchasers, for *valuable consideration*, without notice. Justice Story, 3 Pet. U. S. R. 486, remarks, that the rule drawn by Lord Eldon from a most learned and critical examination of all the authorities is, that where there is a bequest to trustees for charitable purposes, the disposition must be in chancery, under a scheme to be approved by a master. But where the object is charity, and no trust is interposed, it must be by the king, under his sign manual. Lord Eldon is not always happy in conveying his ideas with precision, however accurate his ideas upon legal subjects may be. I presume he did not mean to say, that in all cases the control of charities was under the king's sign manual, where there was not a bequest to trustees. In the case referred to, in which Lord Eldon made the remark alluded to, *Moggridge* vs. *Thackwell*, 7 Vesey 86, Vartin, the intended trustee, had died in the life-time, yet the chancellor took jurisdiction under

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

his general equity powers. The rule I consider to be, that wher- ever there is a general charity, with discretionary powers, it is not a trust.—7 Vesey, 85. The disposition and establishment of it, or in other words, the application of it to charitable objects accord- ing to some fixed plan or definite purpose, and thereby converting it into a trust, is in the king. But in the case even of general charities, when there are trustees with full discretionary powers of disposition, its disposition is not under the sign manual.—*Waldo* vs. *Baley*, 16 Vesey, 210, 211. If in the latter case the trustee should die, it then becomes a general charity, under the king's dis- posal.—*Attorney General* vs. *Berryman*, 1 Deck. Rep. 168.

In the case of charities to be distributed according to a fixed purpose and among objects answering to that purpose, they are the *cestui que trusts*, uncertain in some measure, but still as certain as the subject of general charities will admit of; and in such cases, they are under the control of the chancellor, as already shown, in virtue of his general equity jurisdiction; and applying the general principle applicable to all trusts, equity will, when, by supplying a trustee, or converting the heir into a trustee. See the case of *Moggridge* vs. *Thackwell*, 7 Vesey, 86—*Attorney General* vs. *Lady Downing*, Ambler, 571—3 Peters, 119—Bridg. Duke, 163, which was a case upon ordinary judicial equity—*Beattie* vs. *Kurtz*, 2 Peters U. S. Rep.—*Pawlet* vs. *Clarke*, 9 Cranch, 292, in both which cases no trustee was created. In 1 Mad. Ch. Rep. 62, on the application of certain inhabitants, &c. a corporation who had committed a breach of trust were removed and new trus- tees appointed. See also *Bull* vs. *Bull*, 8 Conn. Rep. 51—9 Cowen, 484-5.

It only remains to show, that there are in this case competent parties before the court to enable them to render the requisite de- cree.

The bill is exhibited to settle the construction of the will, and that the claimants may interplead. The money is in the court, or under its direction and disposal. There is no complaint of breach of trust, no trustee to be appointed, no continuing trust required. The societies are entitled to the disposal of the money. There is no complaint or well grounded apprehension, that they will misap- ply the money. In such a case, the presence of the attorney gen- eral for the state is not necessary. In *Wellbeloved* vs. *Jones*, 1 Sim. and St. 40, the question came up directly before the court, and although in that case the presence of the attorney general was required, the court laid down this distinction. " It has been held

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
not to be necessary that the attorney general should be a party when a legacy is given to the *treasurer* or other *officer* of some *established charitable institution*, to become a part of the *general funds* of that institution. And the exception is reasonable, for the *attorney general* can have no interference with the distribution of their general funds. Whenever there is a general charity not in trust, and the purposes of it are not established, if a suit is brought in respect to it to collect the funds, or for any other purpose, it must be in the name of the *attorney general*. For there are no competent persons to bring the suit.

In the case of charities with a definite purpose, and a scheme administered either by the trustees or others, or of charities administered by the trustees at their discretion, and in the latter case the trustees alone, or in the former case, the managers of the charity, in collusion with the trustees, abused the trust, then the *attorney general* must call them to account. But here there is nothing for the attorney of the state to do. The charitable institutions are entitled to the funds, they may sue and be sued in equity, in the name of one or more, on behalf of the others. It was so in *Beatty* vs. *Kurtz*, 2 Peters.

The proper person to sue and be sued on behalf of the institution is the treasurer. A payment to him is a payment to the institution. The attorney for the state, if before the court, would not receive it.

In the following charity cases, the attorney general was dispensed with:—*White* vs. *White*, 7 Vesey, 422. *Waldo* vs. *Baley*, 16 Vesey, 211. *Provost of Edinburgh* vs. *Aubery*, Amb. 236. *Oliphant* vs. *Hendrice*, 1 Bro. Ch. Cas. 571. *Campbell* vs. *Radnor*, 1 Bro. Ch. Cas. 271. *Curtis* vs. *Hutton*, 14 Vesey, 537. *McIntosh* vs. *Townsend*, 16 Vesey, 330. *West et al.* vs. *Knight*, 1 Chan. Cas. 134. *Pensted* vs. *Payer*, Duke, 381. The above case in Zanes's will. *Shotwell* vs. *Hendrickson*, above referred to. *Bowden et al.* vs. *McLeod*, 1 Edw. Ch. Rep. 588. *Coggeshall* vs. *Peltson*, 7 John. Ch. Rep. 292. *Jones* vs. *Williams*, Amb. 651—Ib. 524. *Moggridge* vs. *Thackwell*, 7 Vesey, 36. *The town of Pawlet* vs. *Clark's Ex'rs*, 9 Cranch. 4 Vin. 500.

It is well settled, that in charity cases as well as others, bequests may be made to foreign objects.—Amb. 236. 1 Bro. Ch. Cases, 571, 171, 444. 16 Vesey, 537. 4 Vesey, 433. 16 Ves. 330.

My purpose has been to show, that in a civilized country, with an enlightened administration of justice, that large portion of property, which, under the influence of Christianity, purified from the

effects of superstition, is entrusted to charitable institutions to administer to the necessities of the poor and afflicted part of the human family, is not placed beyond the pale and protection of the law.

BENNINGTON,
February
1835.

Ex'rs of Burr
vs
Smith et al.

*Smith and Robinson for the residuary legatees.*—It is contended, on the part of the residuary legatees, that no persons are designated in the will, who can claim either at law or in equity, as trustee, or as *cestui que* trust; that the trust is ineffectually declared, and that the monies bequeathed vest in the residuary legatees, discharged of the trust.

1. The first inquiry to be made is, what was the intention of the testator, as indicated by the terms of the will.

(1.) It was obviously the intention of the testator to make the bequests payable to the treasurer of the several societies in his official and not in his private capacity.

There are no terms to be found in the will, indicating the testator intended he should take personally.

The monies are expressly given for the use and purposes of the society, and no personal benefit was intended the treasurer.

The language, therefore, in the will, " I bequeath to the treasurer of," &c. without any thing further, shows the treasurer takes during his continuance in office.

In the case *Attorney General* vs. *Tancred,* 1 Wm. Blk. Rep. 91, where a conveyance was made to certain officers of a corporation, and not to the corporation itself, and *Morrice* vs. *Bishop of Durham,* 9 Vesey, 399, and 10 Ves. 522, where the devise was to the Bishop for such objects of liberality and benevolence as he might approve of, it was held the individuals could not claim personally under the official description, for the plain reason no personal benefit was intended.

The case of *Attorney General* vs. *Cook,* 2 Ves. Sen. 273, where a bequest was made to a Baptist minister, is to the same effect. *Unquharth* vs. *King,* 7 Ves. 224. The rule is the same at law.—*Piggot* vs. *Thompson,* 3 Bos. and Pull, 147. 13 John. Rep. 38–9. Mass. Rep. 325. 2 Conn. Rep. 680. 1 Cranch, 345. 1 Chip. Rep. 296.

There is another expression in the will, which is decisive of the question, viz: " I give and bequeath to the treasurer for the time being of," &c. This is the most apt phraseology the testator could have selected, to make the bequest payable to the individual who should from time to time be treasurer. Such is the popular im-

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

port of the term. It is repeatedly used in our statute by the legislature in the same sense.—Stat. ch. 47, number 1, sec. 22, 23—chap. 49, number 1, sec. 3—number 2, sec. 1—chap. 50, number 1, 3, 4.

It has received a determinate meaning by judicial decision—it is of equivalent import with the word successor.

In *King* vs. *Morrice*, 4 East. 26, Lord Ellenborough says this phrase, 'time being,' means no more than *hodierne diurne*; that it refers to individuals in succession. *The Attorney General* vs. *Munby*, 1 Merv. 327, is decisive upon this point. The grant in that case was made to the Rector for the time being; the grantor was the then Rector. The grant was held good under the mortmain act, as the grantor could not claim in his *private capacity*. *Inglis* vs. *Sailor's Snug Harbor*, 3 Pet. Rep. 147, Judge Story's opinion. It is used in the same sense by Lord Hardwick, in the case of *Baylies* vs. *The Attorney General*, 2 Atk. 239, and so in all cases and books, both at law and in equity.—*Paine* vs. *Archbishop of Canterbury*, 14 Vesey, 365. *De Garcin* vs. *Lawson*, 4 Vesey, 433, in note. *Attorney General* vs. *Lepine*, 19 Ves. 309. 9 Cow. 486.

There is another expression in the will, which is equally decisive, in the case of the Home Missionary Society. The expression alluded to is, " I do hereby direct my executors to pay said sum of," &c. to the treasurer of said society. The words " said treasurer," used in reference to the other societies, is an expression to the same effect.

The individual then to whom payment is made must at the time the monies are handed over, be the treasurer of the society.

In case of death or removal of the treasurer, payment must be made to his successor.

Besides, the treasury is the place of deposit—the office of treasurer is merely to keep the money. The expression used is, a direction to pay into the treasury the monies bequeathed, and of course the money must be paid to the individual who is from time to time treasurer.

In addition to this, the bequests are to be paid in five annual instalments.]

- The treasurer of the several societies is elected annually, and consequently is liable to removal from office, and also death. This was all in the mind of the testator: hence he anticipates it, and makes the provision that the bequests should be payable to the in-

dividual who successively from time to time, holds the office of treasurer.

This too is admitted in the answers of the several treasurers filed in the case. The monies are claimed in their official, not in their private capacity.

2. It was the intention of the testator, the society should, in their character as such, execute the trust. The bequests are for the uses and purposes of the society, and of course it belongs to the societies to apply the monies.—*Baptist Association* vs. *Hart's Ex'rs,* 4 Wheat. Rep. 1. *Green* vs. *Dennis,* 6 Conn. Rep. 299 & 300.—2 Conn. Rep. 287.

3. There are no *cestui que trusts,* or persons named in the will, who can claim the benefit of the bequests. The monies being given for the uses and purposes of the society, before any person can claim it, it is necessary the society should select, or designate the persons or objects to be benefitted.

The American Bible Society was organized for the purpose of encouraging and promoting a wider circulation of the Bible without note or comment, throughout the United States, and their territories, and also in other countries, whether Christian, Mahometan or Pagan. Now what country, kingdom, state, city, town, or individual, can claim the benefit of this bequest?

The other bequests are of the same indefinite character, and it is perfectly obvious no one is designated to take beneficially.

2. Is a devise to a voluntary association, or community not incorporated, or persons in succession not incorporate, void at law?

It is a well-established principle at law, that a devise or grant to a voluntary association, or persons in succession not incorporate, is void.—1 Sw. Dig. 135. Coke Lit. 95, *a.* Shep. Touch. 235. Pow. on Dev. 337. Com. Dig. 35. *Jackson* vs. *Corey,* 8 John. 301. *Hornbeck* vs. *Westbrook,* 9 John R. 73. *Barker* vs. *Wood,* 9 Mass. 419.—12 Mass. 557. *Lockwood* vs. *Weed et al.* 2 Con. 287. 1 Hen. & Mumf. 470. Petersdorf Abr. 8 vol. 91, note. *Baptist Association* vs. *Hart's Ex'rs,* 4 Wheat Rep. 1. *Attorney General* vs. *Tancred,* 1 Wm. Black. Rep. 91. *De Garcin* vs. *Lawson,* 4 Ves. 433, in note to *Corbyn* vs. *French.* Story's Opinion, 3 Pet. Rep. 6 Con. 293.

The authorities above cited, abundantly establish the position, that the bequest in this case being made to a voluntary society, or persons in succession not incorporate, is utterly void in law.

3. Can this court, as a court of chancery, establish a devise void at law?

BENNINGTON,
February,
1835.
───────
Ex'rs of Burr
vs.
Smith et al.

The treasurers not being incorporate, cannot claim or demand the monies, or sustain any suit for their recovery in equity. The societies not being incorporated, are in the same predicament.

The description of the *cestui que trust* is so vague that no persons can be found, who have such an equitable interest, as will enable them to claim in equity.

When an interpleading bill is brought, it must appear there are persons capable of interpleading.—1 Mad. Chan. 176. 2 Swift's Dig. 207.

If the orator in chancery is not entitled to sue by reason of any personal disability, the defendant may demur, as in the case where a bill is brought by an infant, feme covert, idiots or lunatics.—2 Mad. Ch. 292. 2 Sw. Dig. 219 & 224. *Lloyd* vs. *Loring*, 6 Ves. 773.

Where the bill was filed in a corporate character, and it appeared on the face of the bill, the orators were not entitled to sue in that character; it was held a demurrer would lie.

In the case of *Baylies* vs. *The Attorney General*, 2 Atk. 239, Lord Hardwick says, "Though the Alderman and inhabitants of a ward are not a corporation, yet as they have made the Attorney General a party, I can make a decree," &c.—most clearly intimating the alderman and inhabitants not being incorporated, could not sustain a suit in equity.

So in all cases where the bequest is to persons in succession, not incorporated, the suit in equity must be in the name of the attorney general.—*Attorney General* vs. *Tancred*, 1 Wm. Black. 91. *Attorney General* vs. *Cook*, 2 Ves. Sen. 273. 4 Wheat App. 8.

In the case of *Merrill* vs. *Lawson*, (4 Vin. Abr. 500) Lord Chancellor Parker stated the rule to be, when a charity is given to persons uncertain, and incapable of sueing and being sued, the bill *ex necessitate rei* must be in the name of the attorney general.

The reasoning of Chancellor Jones, (9 Cow. 282 & 283) and also Judge Story, (3 Pet. Rep. 500) is to the same effect.

In the cases of *The Baptist Association* vs. *Hart's Executors*, *Ingliss* vs. *Sailor's Snug Harbor*, *McCarter* vs. *Orphans' Asylum*, *Town of New Rochelle*, (7 John. Ch. Rep. 292) and *McGir* vs. *Aaron*, (1 Penn. 49) the persons sueing were incorporate at the time of commencing the suit.

In the case of *Bartlett* vs. *King*, (12 Mass. 542) and *Whitman* vs. *Lex*, (17 Serg. & Rawle, 88) there was a competent trustee appointed in the will to execute the trust.

So that there is no case to be found to warrant a suit in favor

BENNINGTON,
*February,*
1835.

E'rs of Burr
*vs.*
Smith *et al*

of the society, or treasurers, or any other person, to enforce the present bequest.

Whether the state, as *parens patriæ*, can claim these bequests, is a point which does not arise—the state not being a party.—4 Wheat. Rep. 50.

In a case like this in England, there must be an express application to the king for a sign manual.—*Attorney- General* vs. *Herrick*, Amb. 712.

The state cannot express its determination to claim the bequests except by special act of the legislature. This has been considered by some judges equivalent to the king's sign manual.

There is no probability that the state will ever interfere; and if not, the residuary legatees are entitled to the monies.

It is believed that if the state, as *parens patriæ*, should attempt to claim the bequests, and pass an act in any shape for that purpose, it would be of no avail.

The king holds his office by divine right, and has his prerogative in right of his regal dignity and out of the ordinary course of the common law.—1 Bl. Com. 239 & 240.

Can a right derived from such a source, and so perfectly odious, be set up in this country, and that too by a government having no power except what is derived from the people?—Fonb. Eq. 491, note last ed.    2 John. Ch. Rep. 389.

2. If the societies or their treasurers were to become incorporated, or there were any persons competent to sue, the court of chancery in this state have no power to enforce the bequest.

The constitution and laws of this state vest in this court only the equity jurisdiction of the English court of chancery—no distinction therefore can be made here, on the ground that charity is the legatee.

It is admitted that a different rule prevails in England when a bequest is for charity.

The king, as *parens patriæ*, has the superintendence of all charities.

The attorney general, at the relation of some informant, files *ex officio* an information in the court of chancery, to have the charity properly established.

The jurisdiction thus exercised, does not belong to the court of chancery as a court of equity, but as administering the duties and prerogative of the crown.—3 Bla. Com. 47, 427. 1 Bla. Com. 303, note. 2 Fonb. Eq. 207. Coop Eq. Pl. 27. Mit. Pl. 29. 2 Vern. 342. *Corporation of Burford* vs. *Lenthal*, 2 Atk. 551.    3 Pet. Rep.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
App'x. 4 Wheat, 47. 19 Ves. 284, ———— vs. *Sanderson* 2 Hovender on Frauds, 288.

The law of charities in England originated in the statute of 43d Eliz. Ch. 4.—1 Fonb. Eq. 25, note, par. 1 ed. 1831. Rob. on Frauds, 358, and note. Rob. on Wills, 213. *Attorney General* vs. *Rye and Warwick*, 2 Vern. 453. *Attorney General* vs. *Boyer*, 3 Ves. 726. *Bishop of Hereford* vs. *Adams*, 7 Ves. 323. *Attorney General* vs. *Jackson*, 11 Ves. 365.

What seems to be conclusive on this point is, that no information lies in the name of the attorney general to establish a charity, not within the statute.—*Attorney General* vs. *Haven*, 2 Vern. 386. 4 Wheat. App'x, 8.

Shortly after the statute passed, it became a question whether the court of chancery could grant relief by original bill, (2 Fonb. Eq. 209) and that a bill of review was not allowable ; and the reason given was, the chancellor derived his authority from the statute Cro. Char. 40.—*Windsor* vs. *The Inhabitants of Farnham*, 1 Bac. Abr. 592.

It was also held no appeal lay from the decree of the chancellor under the statute.—*Saul* vs. *Wilson*, 2 Vern. 118.

Since the passage of the statute, it has become a general rule that no uses are to be considered as charitable except such as fall within the words or obvious intent of the act.—9 Ves. 399. 10 Ves. 538. 4 Wheat. App'x, 6. *Attorney General* vs. *Brewer*, 1 Swanst. 282, 299, 307.

It has been shown the bequests in this case are void at law. And it is contended independent of the statute of 43d Eliz. Ch. 4, the chancellor in England has no power to sustain a bequest void at Law.—Lex. Testa. 138, 139, 147. 1 Swinb. 106, note. 2 Bl. Com. 376. Rob. on Frauds, 353. 1 Bac. Abr. 582, 583, 585. 1 Cha. Cas. 134, 267, 195. *Smith* vs. *Stowell*, Cas. in Chan. 195. *Attorney General* vs. *Boyer*, 3 Ves. 726. 1 Burr. Ecclesiastical Law, 226.

There is no case, nor can a trace be found in any book, of an attempt in chancery to establish bequests void at law before the statute.

In Porter's case, (1 Co. 22, *b*.) the will was made in the 32d Hen. 8, to the wife of the testator, on condition she should, on the advice of learned counsel, assure the property devised for the maintenance of a free school not incorporated. The wife entered into the property, and instead of performing the condition, conveyed in the 3d Ed. 6, by a lease for forty years. Afterwards, in the 34th

Eliz. the heir entered for condition broken, and conveyed to the queen ; and suit being soon after brought, the court decided the condition was broken, and the entry of the heir was lawful.

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

Now in this case, it was not even suggested there was any remedy for the free school in chancery.

The only mode intimated to help the devise was by act of incorporation and letter of licence.

Lord Coke, who argued the case for the queen, though he cites many antecedent cases, refers to none which were not decided at law. Besides those claiming the beneficial interest, made no *effort* from the time the will was made, or at any rate from the time the condition was broken, until the 34th Eliz., and then they resorted to the circuitous mode of procuring a conveyance to the queen, on whose will the charity would still depend.

Can there be any pretence for saying there was all this time a remedy in chancery for the *cestui que trust* ?

In Hobert, 136, two cases are to be found, where, immediately after the passage of the statute, questions on the validity of wills containing charitable uses void at law, were propounded to and decided by courts of law. This has always been the practice in courts of chancery, and if that court had the power of sustaining such bequests before the statute, similar cases would be found in the law reports.

Bequests made before the statute, and void at law, were, after the statute, looked up, and held to be within the statute. The statute was expressly made retrospective, and these cases were decided on that ground.—*Flood's* case [Hobert, 136—*Collinson's* case, Hob. 136—*Smith* vs. *Stowell*, 1 Cas. in Cha. 195—*Damus'* case and *Rivett's* case, Moore, 822, 890—See *Attorney General* vs. *Rye & Warwick*, 2 Vern. 453, and old cases therein cited.— See for same purpose *Lex Testa.* 140 to 147.—3 Pet. Rep. 492.

The cases immediately succeeding the statute where bequests void at law were held good as charities, were wholly argued and decided on the footing of that staute.—*Parish of Great Creaton,* 1 Ch. Cas. 134.—*Attorney General* vs. *Platt,* Ch. Cas. 267, and Finch, 221.—*Smith* vs. *Stowell,* Cas. in Chan. 195.—*Attorney General* vs. *Tancred,* 1 Wm. Bl. Rep. 91.—*Attorney General* vs. *Cook,* 2 Ves. Sen. 273.—*Jones* vs. *Williams,* Amb. 651.— *Attorney General* vs. *Rye & Warwick,* 2 Vern. 453.—*Piggot* vs . *Penrice,* 2 Eq. Cas. Abr. Sec. 6. *Att'y Gen.* vs. *Hickman,* 2 Eq. Cas. Abr. 193, Sec. 14.—*Lex Testa.* 147, *Rex* vs. *Newman.*

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

Since the passage of the statute of Eliz. the chancellor in England cannot support bequests, where the conveyance is defective, or the objects are incapable of taking, or not sufficiently defined, unless the bequests are made to objects enumerated in the statute, or by analogy deemed within its spirit and intendment.—*Morrice* vs. *The Bishop of Durham*, 9 Ves. 399. S. C. 10 Ves. 538. *James* vs. *Allen*, 3 Merv. Rep. 17. *Vesey* vs. *Jameson*, 1 S. & S. 62. *Fowler* vs. *Garlike*, R. & R. 232.

The last two cases are cited in the 17th vol. of the American Jurist, 134. *Coxe* vs. *Bassett*, 3 Ves. 155 & 164. *Att'y Gen.* vs. *Whorwood*, 1 Ves. Sen. 534, cited 9 Ves. 400. See 4 Ves. 434, *Corbyn* vs. *French*, note. See also 10 Ves. 534, 538. *Brown* vs. *Youle*, in note to *Moggridge* vs. *Thackwell*, 7 Ves. 50. *De Gracin* vs. *Lawson*, 4 Ves. 433, in note. *Widmore* vs. *Woodruffe*, Amb. 640.

The cases in the United States, where the question now under consideration has been agitated, fully sustain the position that a bequest to a trustee incompetent to take, or which is the same thing, where no trustee is appointed for an indefinite charitable object, is void in equity as well as in law.—*Baptist Association* vs. *Hart's Ex'rs*, 4 Wheat. Rep. 2. 3 Pet. Rep. App'x, 484, 485, 488, 498. *Ingliss* vs. *Sailor's Snug Harbor*, 3 Pet. Rep. 114, 115, 138, 139, 142, 149, 152. *Dashire* vs. *Att'y Gen.* 5 Har. & John. Rep. 392. *McCartee* vs. *Orphan Asylum Society*, 9 Cow. Rep. 469.

In the case of *The Town of New Rochelle*, (7 John. Ch. Rep. 292) the question now under consideration was not raised. Chancellor Kent only cites two cases, and both were decided subsequent to the statute 43d Eliz.

The first case, *Att'y Gen.* vs. *Clarke*, (Amb. 422) was decided upon the statute, and the charity was administered under a scheme.

In the other case, *Jones* vs. *Williams*, (Amb. 651) the devise was held as being against the Mortmain act, and in defining a charity, the chancellor refers expressly to the statute 43d Eliz. chap. 4.

It is said in this case, on the part of the societies, that in a court of equity, a trust can never fail of effect for the want of a trustee, and the court may therefore supply trustees to carry into effect the interests of the testator.

On examining the cases introduced on the other side in support of this position, it will be found either 1st that the trust was definite, and there was a *cestui que trust* designated in the will competent to sue, or 2d, that the suit was a proceeding under the stat-

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

ute 43d Eliz. chap. 4. But where there is neither trustee nor cestui que trust designated in the will, no case can be found where independent of the statute 43d Eliz. chap. 4, the court have supplied a trustee.

Aside from that statute, the rule in equity is well settled, that every trust must have a definite object, and there must be some one in whose favor the court can pronounce a decree.—9 Ves. 323, 404.—10 do. 538.

Whoever is made trustee, the duty must be performed under the eye of the court; and how can the court select and designate the purposes and objects to which the money shall be applied? Can the court exercise a discretion?—*Widmore* vs. *Woodruffe*, Amb. 640. *Brown* vs. *Higgs*, 4 Ves. 708—5 Ves. 495—8 Ves. 570.— *Cruwys* vs. *Coleman*, 9 Ves. 324.

3. The statute of 43d Eliz. and the doctrine of charities which obtain in England, has never been adopted in this state.

(1.) This statute has never been re-enacted in this state. It will hardly be pretended that this statute was in force in this state during our colonial existence, since it was a principle of the common law that English statutes did not extend to the colonies unless specially named.—2 Kent's Com. 6, note a. 2 Salk. 311, 2 P. Wm. 75.

(2.) Every government has a general law regulating the settlement of testate and intestate estates. Our statute recognizes but one privileged testament—that of a soldier in actual service, or that of a mariner at sea. The statute of Eliz. and the system which had grown up under it, were known to our legislature, and if applicable to this country, would have been adopted.

(3.) The statute of Eliz. is one of local policy, and connected with local establishments.—*Att'y Gen.* vs. *Stewart*, 2 Merv. 160. 5 Har. & John. 403. 9 Cow. Rep. 481. 2 Kent's Com. 232 & 287.

(4.) The doctrine of charities is not a legal, but a prerogative system, and cannot be adapted to our form of government.—1 Bl. Com. 303, note 15. Bl. Com. 47 & 427. 2 Fonb. Eq. 207. Coop. Eq. Pl. 27. 2 Vern. 342. 4 Wheat. 47.

(5.) How has this doctrine been viewed by all the modern chancellors? Lord Eldon (in 11 Ves. 365) said, it had been urged by the defendant, and two hundred years ago might have been urged with effect, that no distinction ought to be made between a charity and an individual.

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

The same chancellor, (in 19 Ves. 486) in speaking of the case *Moggridge* vs. *Thackwell*, says, he decided that case, being bound by precedent, and as much against his inclination as any act of his judicial life.

Lord Chancellor Cowper, (4 Wheat. App'x 14) in a case where he was called upon to declare a charitable bequest valid, the will not being executed according to the statute of frauds, observed, "I shall be very loth to break in upon the statute of frauds and perjuries in this case, as there are no instances where men are so easily imposed upon as at the time of their dying, under the pretence of charity."

In looking over all the more modern cases, we find a uniform regret that ever a distinction was made between a charity and an individual.

A constant endeavor to abridge the doctrine, a settled determination not to apply it in a new case, and whenever a charity is upheld, it is on the ground the chancellor is bound so to do, by the force of ancient precedents. Besides, the system is now completely annihilated by act of parliament, 9 Geo. II., commonly called the Mortmain Act.

This act, by all writers, is said to be founded in good sense and sound policy.—2 Mad. Ch. 62. 4 Wheat. Rep. App'x, 22.

In every point of view, therefore, the trust fails, and the money vests in the residuary legatees. The residuary clause passes all personal property not effectually disposed of, as when a legacy lapses by the death of the legatee in the life-time of the testator, or when a bequest of lease-hold estates being to charity is void by statute of 9 Geo. II.—1 Sw. Dig. 457. 2 Bl. Com. 514. 4 Bac. Abr. 429. Toller. Ex. 342. 7 Bac. Abr. 146–7. 2 Cai. Cases in Equity, 336.

The opinion of the court was delivered by·

WILLIAMS, Chancellor.—The case before us is not only important on account of the principles which are to be decided, but also as it decides the right to property of some amount. It was argued two years since ; but the court did not think proper, on the first argument, to decide a case, where the principle involved was so important, and where the decisions in the several states on the subject had been in some measure contradictory. A change having taken place in the members of the court after the first argument, the case was again heard a year ago. As there was only three members of the court present at that time, and their views on the

subject were not alike, it was thought proper to continue the case for further argument; and to prevent any further delay, that it should be heard at this term, by all the judges of the court.

The case now, as heretofore, has been fully and ably argued; and probably all the authorities which have any bearing on the subject, have been brought to our notice. Unfortunately, we are not *now* agreed. We have endeavored to bestow upon it, both now and at the previous arguments, all the consideration which our time would admit; and although we are not all agreed, we are persuaded that this disagreement arises from the difficulty of the subject itself; and that there is no prospect that at any future time, or by any other court, there would be more unanimity.

It is not to be expected that the court would hereafter ever be unanimous; and there can be no use in protracting the decision to any future period. It cannot be necessary, in delivering the opinion of the court, to go into a particular examination of all the cases which have been read or cited. It is due however to the counsel, as well as to the case, to examine the several points which have been made in the argument, as well as the cases read or referred to, in their support; and if they are not mentioned, it is not because they have not been attended to.

In delivering the opinion of the court, I shall only mention the reasons or authorities which have influenced me in coming to a conclusion on this subject. The other members of the court, who concur in the decree, may have been influenced by other and more pertinent and forcible reasons and arguments.

The different parties who claim these legacies, are brought before us by the executors. The funds to pay the same, are placed under our direction; and we must now determine whether these legacies are to be, or can be paid, according to the intention and direction of the testator, or whether that intention is to be frustrated, and the money decreed to the residuary legatees, because his intention cannot be carried into effect under the existing laws.

The first question which presents itself is, whether the several societies, to whose treasurer the legacies are directed to be paid, not being incorporated, can receive the legacies for the purposes for which they were given, or whether they can receive and distribute a gift or legacy, given to a public, pious, or charitable use. I shall not inquire whether the uses intended were of that kind which are denominated pious or charitable, as this has not been denied in the argument; and indeed they are strictly of that char

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

acter which by all the writers, either on the civil or common law, are denominated pious or charitable uses.—Domat. 2 vol. p. 168, and Seq.

I think we shall find, that societies, or bodies of men, unincorporated, have ever been considered, at common law, as capable of receiving gifts or legacies, to be applied to charitable uses ; and that it has been the invariable policy of our state, to consider them as capable. That they were considered capable at common law, is apparent from the fact, that it was found necessary to pass a statute to make void grants in trust for them. The statute 23d Henry VIII. chap. 10, declares, " If any grant of lands or other hereditaments, shall. be made in trust to the use of churches, chapels, church-wardens, guilds; fraternities, commonalties, companies, or brotherhoods, to have perpetual obits, or a continual service of a priest forever, or for 60 or 80 years, or to such like uses, or intents, and purposes shall be void, *they being no corporation, but erected either of devotion, or else by common consent of the people.*"—15 Viner. 481.

The passage of this statute, shows that at common law, the want of a charter of incorporation was no impediment to a body of men, changing from time to time, from receiving and distributing according to the intent of the donor, money, or other property, given or granted for a charitable use.

By the statute of 1 Edward VI. chap. 14, all, and all manner of colleges, free chapels, and chauntries, &c., and all manors, lands, tenements, &c. belonging to them, were given to the king. In *Adams* and *Lambert's* case, (4 Coke, 96) where the question was discussed, what chauntries, &c. were given to the king by that act, the distinction between those which were incorporated and those which were not, was recognized ; and although it was resolved that the statute only intended such chauntry as was lawfully incorporated, or at least, had the countenance or beginning of a corporation, yet it was considered that some chauntries, which existed only in reputation, were by that act given to the king : thus it was said, that when a college or chauntry, &c. had such beginning, which might be made a lawful foundation, but for error or imperfection in the penning or proceeding of it, was not in judgment of law lawfully founded, such college or chauntry is given to the king by the said act ; but when they existed only in reputation, they were not given to the king. Several instances are there mentioned, where lands are given for the use or purpose of chauntries not incorporated.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

In *Porter's* case, (1 Coke, 21) which is a very prominent one in all the arguments which have been made on the subject of charitable uses, and to which our attention will be directed in another part of the case, we find the existence of such societies or companies not incorporate, very distinctly recognized. The testator had devised certain lands to his wife, upon condition that she should assure, give and grant the same for the maintenance and continuance of a certain free-school, certain alms-men and women forever. The condition was not performed, and the heirs entered, and granted to the queen. Porter, who had under the devisee, claimed the land upon the ground that the condition in the will was against law, and so the estate was absolute in the devisee. It was argued for him, that though the object was a work of charity, and good in itself, yet that the statute of 23d Henry VIII. chap. 10, was entended to abolish good uses as well as others, that the intent of the statute was for the benefit of the lords, and that feoffments made to the use of companies *not incorporate*, were as prejudicial to lords as alienations in Mortmain.

Sir Thomas Edgerton, who was then attorney general, and Sir Edward Coke, for the queen, contended that the use was not void ; that neither the act aforesaid, or any other laws of Henry VIII. or Edward VI. were intended to abolish good or charitable uses, but that they were intended to be maintained—that it would be dishonorable in the law to make such good uses void ; and they said, that almost all the land belonging to the towns or boroughs, *not incorporate*, are conveyed to several inhabitants in trust and confidence to employ the profits to such good uses as repairing highways, repairing the church, maintaining the poor of the parish, &c. ; and they seriously contended that the statute of wills, by excluding bodies politic and corporate from being devisees, intended to make *companies not incorporated* capable of receiving a devise. It is to be remarked however, that on this latter point, the court did not deliver any opinion ; yet the court decided, that the statute was not intended to extend to take away the good and charitable use. It is certainly worthy of remark, that all the counsel in the case distinctly recognized unincorporated companies as capable of being *cestui que trusts* in a gift or grant to a charitable use.

In a case decided in the circuit court in the district of Pennsylvania, on the will of Sarah Zane, Judge Baldwin, in an opinion in which he investigates the whole subject of charitable uses, remarks, that the common law requires no charter to enable a body of men in any place, to purchase chattels, or receive donations of money, a chat-

Bennington,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
tel interest, or an estate, for the lives of the grantee in land by their
name as a body, without other words, "that a charter is necessary,
to enable them as a natural person, capable of enjoying an estate
in fee, without words of inheritance," to which it may be added,
that to enable them to have perpetual succession, or to receive
goods or personal property in succession, probably an act of incor-
poration is necessary.   In this state, it appears to me, that a decis-
ion that a company of individuals are incapable of receiving gifts,
for a public or charitable purpose, or that such a society should not
be protected in the enjoyment of property given to them, (and I
can make no distinction between protecting them in the enjoyment
of property of which they are actually in possession by gift, and en-
abling them to recover that which is bequeathed to them by will)
would be at variance with all our received ideas since the establish-
ment of the state—at variance with the constitutional provisions
made on the subject, and directly at war with the principles of re-
ligious freedom.   It has always been the practice in this state, and
may be considered as their settled policy, to encourage voluntary
associations for public, pious and charitable purposes.   All corpo-
rations at times, and religious corporations at all times, have been
viewed with a jealous eye.   It is very rare that any acts constitu-
ting an ecclesiastical or eleemosynary corporation, or for any reli-
gious purpose whatever, have been suffered to pass the legislature.
But a few years since, when an act incorporating "The Baptist
General Convention," which was solely for the management of their
funds, had passed the house of assembly, it was met in the council,
by reasons so able and so unanswerable, that there was no further
disposition to press the subject upon the consideration of the legis-
lature.   It has been considered by community generally, that asso-
ciations may be formed, money subscribed and collected, property
given and received, for the promotion of any cause interesting to
the public, and designed to subserve their interests, or for the en-
couragement or promotion of charity, morality, learning, or religion.
So far as it respects the support of religious teachers, or ministers
of the gospel, the spirit of our constitution and laws has for a long
been considered as opposed to any legal provision.   And although
laws were formerly passed for the support of the gospel, and making
provision by law for collecting taxes for their support, yet these
provisions were rejected by most of the religious denominations
among us.   They created so much dissatisfaction, that their repeal
was imperiously demanded, both by public sentiment and by the
constitutional tribunal, whose duty it is to inquire whether the con-

stitution has been regarded.  Our statute for the support of the gos-
pel,  passed in 1797  and in 1814,  (page 600 and 601 of statute)
yet contains a provision, that voluntary associations for hiring a min-
ister, or erecting a place of  public worship, or for the settlement
and support of a minister, may for some purposes become a body
corporate.  Yet it is believed that a great, if not the *greater* part
of our religious teachers, are supported and maintained by volunta-
ry associations, who do not avail themselves of the provision of the
statute to become incorporate.  Associations for all public, pious
and charitable purposes, have taken subscriptions, held property
which has been given to them either by contribution or otherwise,
and performed all and every act necessary for the objects contem-
plated by their association, without any doubt being entertained of
their ability so to do.  Legacies have been given for public and
charitable purposes, and no questions made as to their legality or
validity.  Every constitution of government which has ever exist-
ed since we became a state, have recognized these voluntary asso-
ciations as deserving of encouragement, and have considered them
as standing on the same ground, whether simply *united* as a volun-
tary association, or *incorporated* by an act of the legislature.  The
41st section of our constitution provides, "That all religious socie-
ties, or bodies of men, that may be hereafter *united* or incorpora-
ted, for the advancement of religion and learning, and for other pi-
ous and charitable purposes, shall be encouraged and protected in
the enjoyment of the privileges, immunities and *estates,* which they
in justice ought to enjoy, under such regulations as the general as-
sembly of this state shall direct."  I think it may at least be said
to admit of a doubt whether this clause in the constitution does not,
in fact, give to all voluntary associations, for the purposes therein
expressed, more extensive and large powers, than have ever been
claimed for the associations who are made the subjects of the boun-
ty of Mr. Burr in this will.  All that is asked for by these associa-
tions is, that they may receive, for the purposes of their association,
either a gift of money from a person living, or legacy from him, to
be paid after his decease.  It may be contended, that this clause
in the constitution is intended directly to place bodies of men, uni-
ted for the purposes there mentioned, on the same ground as bodies
incorporated, so far as to enable them to receive property given to
them, and protect them in the enjoyment thereof, subject only to
be regulated by the general assembly, by some general law, appli-
cable to all such associations, whenever the public interest should
require such regulation : And until such law should be passed that

36

Bennington,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.
they should be left free to receive, hold, and enjoy all such estates as might be acquired by them for the legitimate purposes of their associations.

Leaving this part of the subject, however, to be disposed of whenever it shall become necessary to decide upon it, I shall only remark, that no legislative provision is necessary to enable any body of men to avail themselves of the benefit of this clause in the constitution. The legislature may regulate, or they m ay restrain within proper limits, all these societies ; but their aid is not necessary for the purpose of enabling the bodies of men united for the purposes contemplated by the constitution, to enjoy what the constitution has guaranteed to them. To decide or declare that a charter or act of incorporation is necessary to enable a society or body of men, united for the advancement of religion, learning, or other pious or charitable purposes, to carry into effect the objects of their association, or to be protected in the enjoyment of their estate, would be in effect to decide that our religious liberties were dependent on the will of the legislature, and not guaranteed by the constitution ;—that the legislature might interfere with the right of conscience, and the free exercise of religious worship, by granting a charter of incorporation, with large powers and capacities to the members of one religious sect or denomination, and withhold ing such charter from those of a different sect. Although the legislature have, in the instance before alluded to, for the support of the gospel, thought proper to declare these privileges and immunities, and in some measure to enlarge them by providing that they may become incorporate, yet they have never thought proper either to regulate or restrain them from the freedom of opinion on religious subjects, which it has always been our policy to tolerate and allow. No statutes of Mortmain have been passed, as none have been required for the interest of the public,—no statute to prevent superstitious uses. We have a better protection against superstition, in an enlightened public sentiment, than from any statutes,—no statutes to promote one sect of religion, to the exclusion of another. Error of opinion on this subject is to be corrected by reason and reflection. No statutes to restrain or to encourage charitable donations or legacies, believing that men, as to this, were better able to judge for themselves, than the legislature to judge for them. No fears have been entertained by our legislature, that heirs might be improperly disinherited—that religious societies would grow too rich or powerful—that any one denomination or sect could so far obtain the ascendency as to persecute the other, or deprive them of

the free exercise of their particular opinions or dogmas; but the good sense of the people has been considered as amply sufficient to guard against any evils which might be supposed to arise from the want of legislation.    From the neglect of the legislature to make any provisions on this subject, we may infer, that whatever sentiments or feelings individuals may have had or expressed, they at least, as a body, are fully satisfied that no injury can arise here, from the unrestrained exercise of religious freedom ;—that they are convinced, that none of the reasons, which in another government dictated the statutes of Mortmain, the statutes to restrain gifts to superstitious uses, or the statute to regulate or restrain gifts to charitable uses, have any existence in this state.    Individuals may here associate for the purpose of erecting a public monument, or any works of public utility, any memorial of heroism, patriotism or valor—they may unite for the purpose of erecting a monument in commemoration of the battle of Bennington, as they have in another state of the battle of Bunker Hill—may erect houses of public worship, print and distribute books, tracts, political or religious papers or pamphlets—may receive subscriptions or legacies therefor, and the law will so far encourage them as to protect them in the enjoyment of whatever may be received or bequeathed for that purpose.    The different denominations of christians, whether Catholic or Protestant, the Jew or Mahometan, may here associate for the purpose of enjoying their particular religious tenets, build churches, monasteries, synagogues, or mosques, and are equally entitled to the protection of the law.

When we are told, then, of the danger of building up a system of charities—of the danger of disinheriting heirs, or of wills or testaments made by persons in extremes, and are referred to the statute of Geo. II. as wholly destroying bequests for charitable uses, we can only answer, that when the legislature apprehend any such danger, they will provide against it ; and until they do, we must administer the law as we find it to be, without any fear of any such consequences.

In considering the powers and capacities of voluntary associations or companies, I have not considered whether they are capable of receiving goods in succession, or whether they have a perpetual existence, as it is not required by the case before us.    The legacies here given and claimed by the associations, mentioned in the will of Mr. Burr, do not contemplate a perpetuity or require a perpetual existence in them, to carry into effect the intention of the testator.    It is an attribute of a corporation aggregate, to re-

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

ceive lands or goods in succession, and a gift or grant to them, without any term of inheritance, or succession give to them, the whole property in the thing granted. Their life is a perpetuity : Hence a grant to them, which in the case of an individual, would only convey an estate for life, is a grant to them and their successors. It is not claimed by, or conceded to these societies, that they can purchase lands in the name of their association, which shall go to those who succeed them, or that they can take a bond or obligation, and maintain a suit thereon by that name, unless they can claim such an immunity or right, by virtue of the constitution before mentioned, which is not here insisted on. It is contended, however, that they may receive a gift of money for a charitable use,—that they may be protected in the enjoyment of whatever is thus given, and that if they are disturbed in this enjoyment, they must have some appropriate remedy therefor ; and thus far the court are disposed to say, that both by the common law and the usages and practices of this state, as recognized by the constitution, they are capable, and may be protected.

As these associations for public and charitable purposes are found to exist among us—as they have ever here existed, are recognized and provided for, and their immunities and privileges guaranteed by the constitution—as they have always existed both in countries subject to the common law and to the civil law, and a vast amount of property has always been given, and is still given to them, to promote works of public utility, convenience or ornament, or works or acts of piety, learning or charity, it is important to inquire whether they can be thus protected in the enjoyment of their property. And here it will be perceived, that unless they can come into some tribunal, provided for the administration of justice—unless some court has jurisdiction over them, they are without the pale of the law, and their whole funds at the mercy of every one who may be disposed to invade them. If their treasurer should squander their funds, or any one who receives their subscriptions should choose to appropriate the money to himself, there could be no tribunal to call them to account. It is believed, however, that they can be protected in the enjoyment of these funds, by courts of justice,—that a suit can be maintained against any one who illegally comes into the possession of their property,—that a bond or note, given upon good and valuable consideration to them, even by their name of association, might be collected in the name of some proper party, connected with their right to hold money or property given to them, and to maintain actions against one who despoils them of it, must

be the right to sue in a court of justice, and to demand before a proper tribunal, legacies given to them by a will.

The cases are numerous where associations of this kind have been recognized as entitled to equitable rights, and as competent to come into a court of equity in the name of one or more of their members, for the benefit of the whole.

In the case of *Terrel and others* vs. *Taylor,* (9 Cranch, 43) Judge Story remarks, that if the plaintiff have shown a sufficient title to the trust property, the court could grant the relief prayed for,—that it can make no difference whether a society was incorporated or not; for in equity, as to objects which the law cannot but consider as useful and meritorious, the same reason would exist for relief in the one case as in the other. It is to be noticed, that in this case, there was a bill filed by the plaintiffs, as members of the vestry of the church in Alexandria, in behalf of themselves and other members of the church. In *Beatty and others* vs. *Kurtz,* (2 Peters. 566) a bill was sustained in the name of a committee of a voluntary society. Lord Eldon, in *Cockburn* vs. *Thompson,* (16 Ves. 321) and Lord Thurlow, in *Buckley* vs. *Carter,* (cited in *Pierce* vs. *Piper,* 17 Ves. 11) recognize the same principle. In *Waller* vs. *Child,* (Amb. 526) on a bill brought by the heir at law, to set aside certain charitable bequests, to be paid to the treasurer, for the time being, of a voluntary society, the society was recognized as capable of receiving and disposing of the legacy, and decree was made that the money should be paid to their treasurer. *Wellbeloved* vs. *Jones* (1 Simons & Stuart, 40) was a bill brought by the trustees or officers of an unincorporated society : Their right to maintain the bill was established, as well as their capacity to receive a legacy for a charitable use. Several cases of a similar import have been decided in the several state courts, which it will be unnecessary to examine at this time. It is sufficient for the present to say, it appears to me that the position is established, that voluntary societies, by the common law, were considered as capable of receiving and distributing money and other property given for public or charitable uses,—that they are recognized by the constitution of this state, as existing and to exist for that purpose,—as deserving of encouragement, and entitled to protection in the enjoyment of their estates, and that their rights may be asserted in, and by the judicial tribunal.

This view of the subject alone would in my mind be decisive of the question submitted to us in the present case. The whole doctrine, however, in relation to charitable uses, as well as the juris-

BENNINGTON,
February,
1835

Ex'rs of Burr
vs.
Smith et al.

diction over them exercised in a court of chancery, has been discussed.

It has been asserted, on the part of the residuary legatees, that the law in relation to charitable uses, as well as the jurisdiction of the chancellor over them, is founded wholly on the statute of 43 Elizabeth, sometimes called the statute of charitable uses. That there is a law, or a series of decisions on this subject, establishing or recognizing a rule in relation to them, different from the rules in relation to other subjects, is unquestionable. It is, however, denied that this rule either is founded on that statute, or grows out of any considerations connected therewith; but rather that it arises necessarily from the nature of the use itself. The statute of Elizabeth does not profess to establish any new law upon this subject. The gift, limitations and appointments, which were to be carried into effect under that statute, existed anterior to the passing it. The principles of the law itself, as now recognized, as well as some of its most objectionable features, were known in England long before the passing of that statute. The passages which have been read from Domat, the prevalence of this law wherever the civil law prevails, the several cases which will be noticed, the remarks of Lord Thurlow in *White* vs. *White*, 1 Brown C. C. 15, and the remarks of Chancellor Kent, warrant this opinion. Judge Story considers that the principle of the civil law respecting charities was engrafted into the common law; and Judge Johnson says, that it appears to him demonstrable, that the 43d Elizabeth introduced no new law of charities, and made none valid, not valid before.

From the very nature of the subject, the donations to such uses must be vague and indefinite. The objects to be benefitted are numerous, and must be looked up and ascertained, and the relief must be administered according to the direction and judgment of those who are to select the necessitous objects for whose benefit the use is created; and moreover, the charitable uses themselves will be declared according to the spirit of the age in which they are established. We find that there were a great variety of gifts and grants to pious and charitable uses recognized by the statutes, as well as by the decisions of the courts of justice, from a very early period. They mostly, it is true, partook of the religious character of the age, as for the exercise and celebration of divine services, to find chaplains, &c., many of them for hospitality and the relief of the poor; but very few, however, if any, for the establishment of schools of learning, until the time of Edward VI. In almost every reign, we find that this subject engaged the atten-

Bennington,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

tion of parliament, and that men piously or religiously inclined gave property for the purposes then considered charitable and meritorious.

In the case reported by Sargeant Bendlow, mentioned in Porter's case, and in the note to Porter's case, which was before the 43d Elizabeth, a variety of charitable and meritorious purposes are enumerated, for which lands, tenements, or hereditaments may be given, the objects of some of which must have been vague and indefinite, such as for the use of poor people, the relief and comfort of maimed soldiers, sustenance of poor people, discharging poor inhabitants of common charges, marriage of poor virgins, &c. Whenever a statute was passed on the subject, it was not to create any uses, but either to restrain or to regulate them in such a manner as that the charitable intent should be preserved, and that they should not become prejudicial to the kingdom.

The doctrine of Cypres, which has led to decisions that have very justly been pronounced strange by Lord Eldon and Judge Story, evidently was a principle recognized in the English law at a very early period. In the very able opinion of Judge Baldwin on the will of Sarah Zane, he considers that the statute, de terris templarium, 17 Edward, 2, established and ordained as a principle of the law of England, that lands once given to a charitable use should remain for charitable purposes forever. Certain it is, that the words of that statute, viz. "ita semper, quod pia et celeberima voluntas donatorum teneatur et expleatur et perpetua sanctissime perseveret," afforded a rule which Lord Coke speaks of with approbation in several of his reports. The doctrine of Cypres, or something very similar to it, was there recognized. The original charitable purpose failed by the suppression of the order, and yet the lands were preserved to a charitable use. The order of templars, as we learn from the history of that period, were established at an early day for the purpose of watching the roads leading to the city of Jerusalem, and protecting pilgrims. Their numbers increased, and legacies were annually left to them from every part of Christendom, so that they became rich and powerful. As a measure of expediency and justice, the order was suppressed. In those times of violence, when but little regard was paid to individual rights, we should expect to have seen their possessions seized upon and appropriated to satisfy the rapacity of the powers who then ruled. But the pope, who suppressed the order, thought proper that their property should still be preserved for the purposes for which it was given, and determined to transfer it to the knight's hospitals, and

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

published an ordinance to that effect. The king, Edward II., asserted his own rights and that of his subjects to the possession, and suspended the execution of the ordinance. He consulted the judges, who determined that all the possessions of the templars had reverted as escheats to the lords of the fee. But an act of parliament was passed, assigning them to the hospitalers for purposes similar to those for which they had originally been bestowed on the templars. It is very evident, that a power was here exercised of appointing a charitable donation to a new and similar purpose, on the ceasing of the one to which it was devoted in the first place. The judges of the court determined that the land reverted to the lords, and yet because it had been appropriated to a charitable use, it was considered that it should still continue appropriated to such purposes.

On the suppression of the monasteries in the reign of Henry VIII, such parts of the lands as had been given to *good, virtuous and godly* uses, and been misapplied, were directed to be continued to such uses.

A great object of the statute of Edward I. b. *c,* ch. 14, in dissolving these chapels, chauntries, &c. was, to *convert the funds* from the uses then considered superstitious, to good and godly uses, as erecting grammar schools, &c. educating youth, &c. It evidently appears to have been a fundamental principle on this subject, that where property had once been given to and used for a charitable purpose, the intent of the donor should be respected and preserved ; and where, from reasons of state, it could not be observed in the particular manner by him pointed out, it should be done in such a manner as that it should be preserved for a charitable use.

Now it is of no consequence here to discuss the propriety of this principle, or to inquire whether it was at all times correctly and faithfully observed, so long as we find the principles of the law of charitable uses there existing and acted upon before the statute of Elizabeth was made. In the two instances mentioned, the legacies had been given to the templars, the lands, &c. had been given to the monasteries, the original testators and donors had been long deceased, and they intended to part with their interest in the property bequeathed. Possibly no injustice was done in not permitting this property to revert to the remote heirs and kindred of the donors, and if it had been faithfully applied to new and useful objects, it could not have been a subject of much complaint. Of this, however, we at this age cannot judge with any accuracy.

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

It has been confidently argued, that this statute of Elizabeth made certain gifts to charitable uses valid, which were not valid before; that it has given effect to certain conveyances, which were void before. This opinion is undoubtedly sanctioned by great authority. The language made use of in the early reports gives a strong countenance to this idea. There are, however, not wanting the opinions of eminent judges and chancellors, that the statute introduced "no new law upon this subject, and made none valid, not valid before."

It is to be remarked, that the statute does not seem to contemplate giving effect to any charitable donations, not good before, it recognizes them as existing, and as not having been employed according to the intent of the donors. It adopts the terms which had previously been used to set apart property for such purposes, "*limited, appointed,* and *assigned;*" the same words which were used in the statute of Edward, VI. *c.,* chapter 14, "all lands, &c. given, assigned, limited, or appointed," &c. and the same which are used in conveyances for the purposes of declaring, or in the appropriate words, limiting, appointing, the use for which property is conveyed.

Although it must be acknowledged that the court of chancery went very great lengths in declaring certain wills good as appointments, and although they make use of the terms, "utterly void," yet it was not by virtue of any provisions of the statute that these were declared to be good, but rather because those conveyances should have been held good as appointments before the statute, that they were decreed. Thus in Griffith Flood case, a devise to a corporation was prohibited by the statute of Mortmain, yet the devise was good as a limitation or appointment to a use, to be relieved under the statute, not because it was made valid by the statute, but because it should have been considered good as a limitation or appointment, whether made before or after. Collisom's case was of the same kind. The devise was made before the statute of wills, and as a *devise of the land* was inoperative; but as a declaration or appointment to a charitable use, it was valid, and had the devise been to the use of an individual, it would have been equally good. Although lands could not be devised, yet uses were considered in some respects as chattels, and as such devisable. Chugleigh case, 1 Coke, 121. In the statute of 27 Henry 8, ch. 10, made to remedy abuses, it was recited that the hereditaments of the realm were conveyed without solemn livery by last wills, sometimes by bare words, and sometimes by signs in great extrem-

BENNINGTON,
February,
1885.

Ex'rs of Burr
vs.
Smith et al.

ities. That the courts went very great lengths in the application of these words, "limited and appointed," both to conveyances and devises, in order to extend the relief given by the statute of Elizabeth, is very apparent; and some of the cases are not to be reconciled either by the law, as existing before, or declared by that statute; although, undoubtedly, some of these devises might be considered as good upon the ground already mentioned. As late as the year 1707, it was claimed that a will without any witnesses, might be good as an appointment to a charitable use, and the cases above mentioned were relied on as authorities for the position, and the Lord Keeper took time to consider before he decided against it.—2 Ver. 597. Lord Eldon, who had bestowed more attention upon the subject of charitable uses than any other chancellor, and who had at different times reviewed all the decisions made on the subject from the earliest period, in one of the last cases which came before him, and in which he reviewed the several decisions reported in Hobart's as well as Revett's case, Platt vs. St. Johns College, Smith vs. Stowell was pressed with the difficulty in considering that the statute of Elizabeth had a retrospective effect in divesting estates already vested. "How," says he, "does the statute make good what was in itself good for nothing either before or after the passing of the statute. Can such a construction be put upon the words which occur in this act as will authorize us to infer that they meant void gifts, limitations, assignments, and appointments?" He came to the conclusion, that it was not clear that these instruments, originally void, were held to be valid by the effect of the statute of Elizabeth, but that there was in the court a jurisdiction to render effective an imperfect conveyance for charitable purposes; that the statute had been construed with reference to such the supposed jurisdiction of the court; so that it was not by the effect of 43d Elizabeth alone, but by the operation of that statute on a supposed antecedent jurisdiction in the court, that void devises to charitable purposes were sustained.—Attorney General vs. The Skinner's Company, 2 Russell, 407. The above case was upon the effect of a will made anterior to the statute, and although the chancellor does not express his opinion with decision, yet with Lord Eldon a doubt expressed upon a subject contrary to the common received opinion was equivalent to a declaration of his opinion and a decision. It is very evident from the whole case, that he considered the idea which had been advanced, that the statute of Elizabeth had a retrospective operation and made good conveyances wholly void before, was destitute of any foundation.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

It appears to me, from the examination which I have been enabled to bestow upon the subject, that the law in relation to charitable uses is not founded on any statute, but that it existed at the common law, the elements of which were derived from the civil law, and the principles of it may be found both in the statutes and in the adjudicated cases, long before the reign of Elizabeth.

The origin of the jurisdiction which has been assumed over these charitable uses by the court of chancery may be a subject of more doubt. On the one side, it has been declared that this jurisdiction originated and was wholly derived from that statute; and on the other, that it belongs to the ordinary judicial equity jurisdiction of the court of chancery; and as was remarked before, there is great weight of authority for either position. The subject itself would seem naturally to belong to the jurisdiction of a court of chancery. If the law was known and established in England, as we have already considered, the remedy for the purpose of carrying it into effect could alone be administered either in that court, or a court having equity powers. Chancery always had cognizance of uses and trusts, and it was only in that court that the execution of a use, which was binding on the conscience of the trustees, could be decreed. The courts at common law had no means to compel the execution of a trust. If the estate was granted upon *condition* to perform a trust, it was forfeited, if the condition was not performed, and the land reverted, as in Porter's case, before referred to. If the land was granted upon *trust and confidence*, to perform a use, as in the case of *Martindale* vs. *Martin*, Cro. Eliz. 288, it did not revert on the non-performance of the trust.

Why should there ever have been a distinction in the remedy to enforce the performance of a trust or use, between those which were limited and appointed to an individual, and those appointed to a charitable use, recognized by the law? The same reason why chancery should take jurisdiction of the one, would require that they should take jurisdiction of the other. Judge Story, in 3 Peters, hazards a conjecture, that Porter's case having established a charitable use, not superstitious, to be good at law, chancery in analogy to other trusts, held the feoffees to uses accountable in equity for their due execution, and that the inconveniences felt caused the statute of Elizabeth to be passed within seven or eight years. But if we are correct in the position, that charitable uses were good long before Porter's case was decided, and some as vague and indefinite as the one mentioned to have been reported by Bendlow, in 5 and 6 Edward, VI. as a feoffment to the use of poor people, and in

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

Plowden, 521, 542, there is no great hazard in believing that chancery, in analogy to other trusts, held the trustees accountable in equity, and compelled their execution whenever the subject came properly before them in court. In my view, it can make no difference when this jurisdiction was first exercised, whether it was assumed or usurped under the statute of Elizabeth or before. It properly belongs to a court of chancery, who are to exercise it so as to give effect to the intent of the donors, where it can be done consistently with the rules which prevail in a court of equity. I think, however, it will be found that this jurisdiction was exercised by chancery long before. It is true, but few cases can be found on this subject before 43 Elizabeth, nor are there many cases in chancery reported for some years after, and until the reign of Charles II. There are some cases collected by Tothil in the reign of James I. and Charles I. and some cases collected in Duke, Charitable Uses. The origin of jurisdiction in England is only a subject of speculative inquiry. Their courts possess and exercise the jurisdiction, and have by their reported decisions established a regular and orderly system of law upon the subject, and it is of very little importance to them whether it was derived from that statute or not. Here it is of more importance to ascertain where the jurisdiction was first exercised in courts of chancery; if in those states where the statute has not been adopted, courts of chancery are precluded from taking cognizance of this subject. Before coming to such a conclusion, we ought to be well convinced that it is a clear and decided point.

The idea that the jurisdiction of the court of chancery, upon informations for establishing charities, arose since the statute of Elizabeth, and that prior to the time of Lord Ellesmere, who was made Lord Keeper in 1596, and Lord Chancellor in 1603, there were no such informations—was first suggested by the Earl of Roslyn, then Lord Loughboro', in the year 1798; in the case of the *Attorney General* vs. *Bower*, (3 Vesey, 726) and I am not aware that it has been suggested by any other chancellor in England. Judge Story attributes this suggestion to Lord Eldon, who was not created chancellor until some years after. The result of Lord Eldon's researches, evidently led him to a different conclusion, as we may learn from his remarks in *Moggridge* vs. *Thackwell*, (7 Ves. 69) and in *Attorney General* vs. *The Skinner Company*, (2 Russel, before mentioned). Lord Thurlow considered that the cases had proceeded upon notions adopted from the civil law, which was favorable to charities, that legacies given to public uses, not ascer-

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

tained, should be applied to some proper object.   Lord Keeper
Henley says, that the uniform rule has been, both before and after
the statute of Elizabeth, for the court of chancery to aid a defec-
tive conveyance to such charitable uses, where the person had pow-
er to convey.—1 W. B. 90.   The same case is reported in Eden,
who was a connexion of the Lord Keeper.   And there is no rea-
son to believe either that he was mistaken, or that his language is
incorrectly reported.

Lord Macclesfield, in the case of *Eyre* vs. *Countess of Shafts-
bury,* (2 Pere. Wm. 119) declares, that it was every day's prac-
tice, antecedent to the statute of Elizabeth, to file informations in
chancery in the attorney General's name, for the establishment of
charities.

Lord Redesdale, in the case of *Attorney General* vs. *The May-
or of Dublin,* (1 Bligh. Parl. Rep. 347–8) is very full and expli-
cit upon this subject:   He asserts, that not only the law, with re-
spect to charitable uses, was the same before as after the statute ;—
that the jurisdiction given to commissioners, was a new ancillary
jurisdiction ;—that an information by the attorney general might be
brought before, and the controlling jurisdiction of the chancellor
over the subject, existed before the passing of the statute ;—that it
was found the commission of charitable uses was not the best rem-
edy, and they resorted again to proceedings, by way of information
in the name of the attorney general.

So far, therefore, as we can learn the opinion of the chancellors
in England, with but one exception, they attribute both the law on
the subject of such uses, as well as the jurisdiction of the court of
chancery, to a period more remote than the reign of Elizabeth.   It is
to be remembered, that there is excepted from the operation of the
statute, a very considerable amount of property bestowed for such
purposes.   The act was not to extend to any colleges within the
universities, or to the colleges of Eton, Westminster, or Winches-
ter ; nor to any cities or towns corporate, where there is a special
governor of such lands, &c., and it may with propriety be inquired,
why should a more liberal rule be introduced with regard to the
enumerated indefinite cases, and the excepted cases remain subject
to a more rigid system ?  Who was to exercise jurisdiction over
them ?  Or were the charitable donations or legacies excepted, to
be left as they would be in this country, if chancery has no jurisdic-
tion over them, without protection, and no remedy had for abuse
or misapplication of the funds ?

From the case of the *Attorney General* vs. *Matthews,* (2 Lev.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
167) we learn, that charities not within the statute, were enforced in chancery, on the information of the attorney general. The devise there, was for the *good of poor people forever.* The commissioners had made an order thereon, which the chancellor quashed, because it being a general charity, the commissioners had nothing to do with it; but it was to be determined in the court of chancery, on the information of the attorney general, which he directed to be brought, and on the information made a decree.

In the case of *Attorney General* vs. *Newman,* the court declared, that the king, as *pater patriæ,* may inform for any public benefit, for charitable uses, before the statute.—Cas. in Chan. 157.

From the case of *The Poor of the Parish of St. Dunston* vs. *Beauchamp,* (Cas. in Chan. 193) we learn, that resort was had to a court of chancery, who made a decree, in a case where it was doubted whether the order of the commissioners would be complied with;—that the bill was filed in the name of the indefinite object of a charity, viz, the poor of the parish; and that a decree was made by the chancellor, on an original bill; and though the reporter adds a quere whether such a bill was necessary, the case shows that no doubt was entertained as to the jurisdiction and power of the court.

In the case of *Pember* vs. *The Inhabitants of Kingston,* on the question whether money given to maintain a preaching minister be a charitable use, the Lord Keeper and the Judges decreed, notwithstanding it is not warranted by the statute to be a charitable use, that the same should be paid by the executor, to such maintenance—Tothil, 96.

Other cases might be mentioned, where charities, not within the statute, have been enforced. We shall find also, that there are cases antecedent to the statute of Elizabeth, where the court of chancery exercised jurisdiction, and enforced charities, by their equity jurisdiction. It appears to me that all that is necessary on this point, is to ascertain whether there are any cases of this kind prior to the statute; for if there are any such, it establishes the fact, that chancery exercised jurisdiction, and shows that it was neither given by, assumed, or usurped under that statute. Nor is it material to find any one case of their exercising a jurisdiction over vague or indefinite charities. The question is, did the court take jurisdiction under the common judicial equity powers? If they did, they must enforce them according to the nature of the subject. If there was no trustee, the court could appoint a trustee; as no trust is suffered to fail for want of a trustee. If the objects were indefi-

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

nite, so by far the greater part of the objects of all charitable be-
quests are. Who were to be benefitted by the establishing of chap-
els and chauntries ?—who, by the establishment of hospitals ?—who,
by the establishment of an institution for the sustenance of impotent
men and women—men out of their wits—poor parishioners—for the
relief of the poor and needy, &c. ? If the court of chancery had
power to enforce any charities, they must have been charities of this
description ; for most of them are of this description.

In the few cases before the statute, which are to be found in
Duke, Charitable Uses, we find not only the jurisdiction of the chan-
cellor established, but we find also the elements, or the principles
of the system of law, upon this subject, which have been incorrectly
attributed to this statute. It is to be observed, that this book con-
tains the readings of Sir Francis Moore, who penned the statute,
and who was undoubtedly well acquainted both with the law on
this subject, and also with the jurisdiction exercised, both before
and after the statute. As this book is not in any of the libraries
in this quarter, it may be proper to recite some of the cases which
are there mentioned. We find in page 131, " If a man bequeath
£800 to three parishes, equally to be let out at £5 per £100 by
the church wardens of each parish, this legacy is not within this
statute, but yet the chancellor may give remedy by equity in chan-
cery. If a man devise that the executors or administrators of his
wife shall pay £100 to be lent out to young tradesmen, this devise
is void, because he cannot charge the executors or administrators
of his wife. But if that wife take another husband, and he hath
assets in his hands of the goods of the former husband, those shall
be liable to the charitable use ; and these observations were made
upon a decree in *John Howard's* case, 40th of Elizabeth."

In page 155—" If the use were limited for a chaplain, they may
decree by addition, that the chaplain shall be a preacher, so they
may appoint the nomination of him to a man of science, as a mas-
ter of a college, &c., because such things concur in decency and
order with the intent of the founder, upon a decree made 40th
of Elizabeth."

In page 163—" One Simons, an Alderman of Winchester, sold
certain lands to Sir Thomas Fleming, now Lord Chief Justice,
then Recorder of that town, and this upon confidence to perform a
charitable use, which the said Simons declared, by his last will,
that Sir Thomas Fleming should perform. The bargain was nev-
er enrolled, and yet the Lord Chancellor decreed that the heir
should sell the land, to be disposed of according to the limitation of

BENNINGTON, the use ; and this decree was made the 24th of Queen Elizabeth,
February, before the Statute of Charitable Uses ; and this decree was made
1835.
Ex'rs of Burr upon ordinary and judicial equity in chancery, and therefore it
    vs
Smith et al. seems the commissioners upon this statute may decree as much in
a like case."

In page 154—"In the 11th of King Henry VI. a gift was made
to the intent to find a chaplain *ad divina celebranda,* until the feoff-
or, or his heirs, should procure a foundation, &c. There was no
employment until the third year of King Edward VI. ; and there-
fore, in the Queen's time, one Payne purchased the land as a con-
cealment.   After a commission being awarded upon this statute,
the commissioners inquired and found the gift, and thereupon de-
creed the property to another, from Payne ; but afterwards this de-
cree was made void by the Lord Chancellor, because the use limited
to find a chaplain *ad divina celebranda* was no use within the stat-
ute   But the chancellor, by his chancery authority, may, and
did decree the land to the first use."

In a late case reported, (1 Mylne & Keene, 376) *Att'y Gen.* vs.
*The Master of Brentwood School,* we learn that a decree was
made in chancery, in the 12th year of the reign of Queen Eliza-
beth, before the statute of charitable uses, at the suit of the inhab-
itants of the parish of Southweald, against the heir at law, that he
should execute a conveyance for the purpose of providing a main-
tenance of a school-master and poor people, according to the intent
of Sir Anthony Brown, as expressed in his will.   The Master of
the Rolls, Sir John Leach, expresses himself very decidedly on the
subject of that decree, " That at that time, no *legal* devise could
be made to a corporation for a charitable use, yet lands so devised
were in equity bound by a trust, which a court of equity would
then execute."

These cases are certainly sufficient to convince us, that the sub-
ject of charitable uses was before the court of chancery, and that
decrees were made, by virtue of the chancery authority of the chan-
cellor, and upon his ordinary judicial equity in chancery.   It has
already been remarked, that there are no reports of cases in chan-
cery before that period.   It has been said, that although there are
many cases cited in Porter's case, yet they were all decided at law,
and none in equity.   But when we consider the hostility which exist-
ed about that time, between the court of law and equity, it is not a
matter of astonishment that no reference should be had to the pro-
ceedings of chancery, in discussing a subject or question of pure
law, even if the subject had frequently been discussed in the courts

of chancery. It is very doubtful, however, whether the subject had *very often* been before the courts either of law or equity.. When we remember the spirit of the age preceding, and at the time of the reformation, and until some time after Queen Elizabeth was seated on the throne, it is not probable that there were many cases brought before any of the judicial tribunals. Until the time of Henry VIII. the charities were mostly of a religious character, or intimately connected with the religious or superstitious notions which then prevailed, as has already been noticed. It is not probable that up to this time there was much disposition to divert property, given or bequeathed to pious uses, to any other purpose, however wantonly or extravagantly they may have been expended. The right appropriation of that kind of property, was so intimately connected with the religious duties enjoined and performed, that the fear of ecclesiastical censures, which carried more terror than the process of a court of law, probably prevented many misapplications of the property sequestered for such uses ; and if the trusts were abused or misapplied by the ecclesiastical bodies who had the management, the chancellor was usually selected from that class of persons ; and there were no courts who had either disposition or firmness to resist the religious influence 'exercised by the clergy. After the commencement of the reformation, other causes operated to prevent any legal investigation of this subject. Free schools were erected principally in the reign of Edward VI. and in the beginning of the reign of Queen Elizabeth, intended and supposed to promote the progress of the reformation, and hostile to the interest and feeling of that part of the people who adhered to the ancient faith. After the death of Edward VI. and during the reign of Queen Mary, and we may add for the first years of Queen Elizabeth, it was uncertain what faith would be adopted as the religion of the state.— It was undoubtedly supposed, and expected by many, that the possessions of the monasteries, chapels, &c. which had been suppressed by Henry and Edward, would be restored. The tendency of this state of things, was evidently to cause a laxity in the administration of the law in enforcing the charities of that age, and a consequent abuse and mismanagement of the funds. The trustees, either from fear or avarice, may have felt a disposition to convert the property devoted to public uses, to their own private uses.

In the reign of Henry VIII., Edward VI., and Elizabeth, there would be no disposition to enforce those charities which had been given to promote the interest of the Roman Catholic faith ; and in the reign of Queen Mary, there would be an utter aversion

Bennington,
*February,*
1836.
Ex'rs of Burr
vs.
Smith et al.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith *et al.*

to favor those schools, which had evidently been founded to destroy the faith which she professed to uphold. It is therefore not a subject of wonder if devises and grants to charitable and pious uses were regarded with no favorable eye,—that they should have been suffered to remain dormant, without any attempt to enforce them, either in the courts of law or chancery, or in parliament, from the time of the commencement of the reformation, until it was fully settled, as was the case of the devise which gave rise to *Porter's* case, in 1 Coke, and in the case of the *Thetford School,* which originated the case of *Gibbons* against *Maltyard,* in Popham, and *Martidale* vs. *Martin,* in Croke.

When the statute of Elizabeth was passed, the times probably were such, as to call for a more thorough and searching remedy than had before been had,—to call for an investigation and inquisition in every county and in every diocese. The alms and hospitalities which had been received through the monasteries, had ceased, and there evidently was a general disposition to misapply the funds and abuse the trusts given and created for those purposes.— Hence the statute of Elizabeth was passed, designed, undoubtedl y, to be directory to the chancellor, recognizing that the property given for purposes strictly charitable, had been misapplied, (for it is to be remembered that none of the charities recognized in that statute were of a religious character, except one, viz: for repairs of churches,) authorizing him to award a commission to the bishop of every several diocese, to inquire into all abuses or breaches of trust, &c. and to make order concerning the same. The time had come when they could distinguish between such gifts as were proper to be enforced in the then state of the kingdom, and such as were not; and the statute was passed accordingly. The proceedings under the statute, however, ceased with the necessity which required its passage. Relief, by original bill, was granted at an early day. An appeal was allowed to the House of Lords, and before the passing of the statute of 52d Geo. III. chap. 101, giving a more speedy remedy, the proceedings under the statute had ceased.

The case of the *Thetford School* so fully illustrates that there was no adequate remedy at law, and also that at law, charitable uses were recognized, and where the remedy was, that a short history of the case may not be unappropriate. It is reported in Popham, 6, 7 & 8, by the name of *Gibbons* vs. *Maltyard & Martin,* in Moore, 594, by the name of *Gibbons* vs. *Maltyard,* and in Croke Eliz. 288, by the name of *Martidale* vs. *Martin:*

" In 1566, Sir Nicholas Fulmerston made a will. This Sir Nich-
olas Fulmerston was probably the same person to whom the reve-
nue and site of a monastery was given, on their dissolution, in the
reign of Henry VIII. as he bears the same name, and the dissolu-
tion was within 30 years previous. In this will, he devised to his
executors certain lands for the term of ten years, on condition that
they should find a preacher forever, to preach in the church of St.
Mary's four times in the year, at ten shillings for every sermon ;—
that they should erect a free grammar school, and maintain a mas-
ter and usher, and assure three tenements for the residence of the
master, usher, and their successors forever, and for the habitation
of four poor people. The remainder in the said lands, he devised
to Sir Edward Clark and his wife, who was daughter and heir of
Sir Nicholas Fulmerston—*on condition*, that they should, with-
in said ten years, assure lands and tenements in possession, of the
value of £35 per annum to the executors aforesaid, or their survi-
vors, for and towards the maintenance of the said preacher, school-
master and usher, and for the relief of the poor persons aforesaid ;
and if the said Edward Clark and his wife, should make default, he
then devised that the estate of the said Clark and his wife should
cease in said land, and then the said lands, upon such default,
should go to his executors before mentioned, or the survivors of
them, *upon trust and confidence*, that they or the survivors of them,
should yearly dispose of the rents and profits, in finding the preach-
er and other charitable works aforesaid."

It would appear from the case, as reported in Popham, that both
the executors and Sir Edward Clark were unwilling to carry the
will into effect, and probably combined to defeat the same ; for we
learn, that the executors refused to be executors, and that Sir Ed-
ward Clark entered and attempted to assure other land of the val-
ue of £35 per annum, with a condition, wholly different from that
prescribed in the will. The son of the surviving executor com-
menced an action of ejectment against the person in possession, un-
der the heirs of Sir Edward Clark, who was also heir of Sir Nich-
olas Fulmerston. We find that Sir Edward Clark claimed the
land on the ground that the condition was against law ; and if he
failed on this point, he then claimed that the executor held the
same land on condition ; and as they had failed to comply, he, in
right of his wife, as heir of Sir Nicholas Fulmerston, was lawfully
possessed of the land. It appears however from the case, as re-
ported in Popham, Moore and Croke, that it was decided that
though the executors had refused the trust, they should still take
the land as devisees ; and it was further decided, that the use de-
clared in the will, was not prohibited as a superstitious use, being
in favor of learning and relief of the poor, and secondly that the

BENNINGTON,
*February*
1835.

Ex'rs of Burr
*vs*
Smith *et al.*

Bennington, devise to the executors, on the default of said Edward Clark and
February, wife, was not upon condition, for the devise being upon *trust and*
1835.
Ex'rs of Burr *confidence*, showed that the testator reposed *trust and confidence*
vs.
Smith et al. in them, and would not have the land returned for non-performance
of it.    Nothing is said how this trust was to be enforced, nor is it
suggested that there was no way to enforce it.  The courts of law
could proceed no further, as between the heir and devise, they de-
termined that the devisee, as trustee, was entitled to hold the land.
The land having been thus decided to be in the devisee on trust,
we do not learn what steps were then taken to compel the trustees
to perform the trust.   But from what we can learn of the subse-
quent proceedings, we find there was still a disposition to frustrate
the charitable intent of the devisor, by withholding a part of the
yearly value of the lands ;  for it seems that afterwards, the case
was both in chancery and in parliament, where we learn from Duke,
"breaches of trust were to be relieved, although it was a tedious
and chargeable remedy."    The lands devised increased in value,
from £35 to £100.   A private bill was exhibited in parliament
in the 7th Jac. I.   It was referred to the justices of the court, who
adjudged that nothing should be converted by the devisees to their
own use, but that the whole should go for works of piety and char-
ity, and should be imployed in performance and increase of the
said works of charity.—8 Coke, 259.

   This case, which evidently attracted some notice atthe time,
had also been in chancery ;  for in the preface to Duke, by Bridge-
man, he says, " As early as in the year 1610, in the famous case
of *Thetford School*, it was determined, that where a testator point-
ed out the particular objects of his bounty, the *court of chancery*
will construe his intent imperative, to be not only in exclusion of
his next of kin, but to the disinheriting his heir at law.    Proceed-
ing upon this principle, the *court* uniformly decrees the surplus
rents and profits to the augmentation of the charities."    And he
adds, " The same doctrine has prevailed in courts of equity to this
day."   In the history of this case, we see, that devises to a chari-
table use, were known in the courts of law,—that the court recog-
nized them as good, so far as to determine that the estate should
belong to the trustees for such uses ;  and that the trustees were
not permitted to baffle the intent of the devisor, or appropriate the
property to their own uses ; and that both in chancery and parlia-
ment, the intent of the devisor could be, and was carried into ef-
fect ; and that without any aid or benefit from the statute of Eliza-
beth.   But it may be asked, if the law in relation to these uses,

existed before the statute was incorporated into their law, and the courts of equity had jurisdiction, what was the necessity of passing the statute? This question has been in some measure anticipated, viz. that it was to furnish a more effectual, searching, and less expensive remedy. This was distinctly asserted by the counsel in argument, of the case of *Attorney General* vs. *Dixie*, 13 Vesey, 522, and not denied.

That the proceeding in chancery was tedious and expensive, we learn from the case of *Hynshaw and others* vs. *Morpeth*, (Corporation Duke, 242). The corporation refused to apply the increased value of certain lands, given for a charitable purpose, for the purposes designated, and refused to appear before the commissioners, claiming that they were visitors, and by the proviso of the statute, exempt from the power of the commissioners. The Lord Keeper declared, that as they were trustees as well as visitors, they were not within the intent of the proviso, declaring, " that if it was otherwise construed, this breach of trust would escape unpunished, unless in *chancery* or in parliament, which would be a *tedious and chargeable* suit to poor persons." The heavy expenses attending at that time a suit in chancery, we may conjecture, when we are told, that it had been customary to give presents to the chancellors, the amount of which, as disclosed in the trial of Lord Bacon, was great and extensive. Further, about this time, the contests between courts of law and the chancery was at its height, and suitors, particularly such as were benefited by the charitable donations mentioned, would apply to a court of equity with some reluctance, as it was but a few years from this time that indictments were preferred against the suitors, solicitors, and a master in chancery, for questioning in the court of chancery, a judgment obtained on the king's bench. Furthermore, the practice of the court of chancery was not at this time reduced to much system—the office of chancellor having been filled indiscriminately, as we are told, by lawyers, churchmen, and courtiers. The jurisdiction over a considerable part of the charities then existing, had been given to other tribunals—some to the court of wards and liveries. The lands of the suppressed abbeys and monasteries were placed in the hands of commissioners, under the superintendence of the courts of augmentation of the king's revenue, and it was customary at that time to proceed in cases similar by commissioners. The statute of 13th Edward I. provided, that if lands, given for free alms and relief of the poor, were not employed for that purpose for two years, the lands should revert to the donor, and he might have a writ of *cessavit*, which was un-

BENNINGTON,
*February,*
1835.

Ex'rs of Burt
vs.
Smith *et al.*

Bennington,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

doubtedly effectual as to all that class of charities. To furnish a better remedy, one that should extend to every diocese and every county—that should be attended with comparatively a small expense and charge, and of which any could avail themselves by petition, without being subject to the expense of a suit in equity, or without being subject to cost, unless they objected to the proceedings of the commissioners, were undoubtedly reasons sufficient for passing that statute. But whether they are satisfactory or not, is but of little importance, if it is found that the elements of the law of charity were recognized in the courts of England, and the court of chancery exercised a control over charitable uses before. That there has always been a disposition in England to favor devises and legacies of this character, is not to be denied. The very early decision mentioned by Plowden, (523) where the courts of law upheld a devise to St. Andrews Church in Holborn, by construing it as a devise to the Parson, who was *persona capax*, evinced this disposition. The whole course of their decisions since, has been in accordance with this idea; and where they have considered a charitable use declared in a will good, and have supplied any defect which existed in the will, for the purpose of upholding the use, they have only acted in analogy to their proceedings in other cases. It is a familiar principle, that this court will aid a defective conveyance. The cases where this subject has come before the courts in this country, are numerous. The law, in relation to charitable uses, is recognized in many of our sister states. And it is alone upon this principle, that many of their decisions can be supported.

The case of *The Baptist Association* against *Hart's Executors*, (4 Wheaton, 1) though it was truly a question of local law, arising under a statute of Virginia, repealing in terms the statute of Elizabeth, and which was undoubtedly intended to abolish the law of charitable uses in that state, yet it must be admitted, was decided on general principles, applicable to all the states where that statute is not in force. To avoid coming in collision with the decision in that case, the courts have been somewhat astute in endeavoring to make distinctions between that and the case before them. In the case of *Terrill* vs. *Taylor*, before mentioned, which was before this decision, the law upon the subject of charitable uses was recognized. The case of *Ingliss* vs. *Sailor's Snug Harbor*, (3 Peters.) it appears to me, can only be supported on the principles of the law of charitable uses. It is placed on the ground of an executory devise by one of the Judges, but according to the case of the *Baptist Association*, the devise was void for want of a person to take,

and the estate descended to the heirs, and no courts in this country have ever admitted, that property once vested, can be divested.

Judge Johnson, who concurred in the decree in the last case, considered the law in relation to charities, as existing in the state of New-York. Two of the Judges, viz. the Chief Justice and Judge Story, considered the case of the *Baptist Association* as governing the case before them, and dissented. The case of *Beatty et al.* vs. *Kurtz et al.* (2 Peters. 566) was also a recognition of the doctrine, applicable to public and charitable uses. The conveyance, which was the subject of that suit, as the court say, if valid, must have been considered as valid upon other principles than those which ordinarily apply between grantor and grantee.— The law in such cases, in the language of Judge Thompson, (6 Peters. 435) applies to those rules adapted to the nature and circumstances of the case. In delivering the opinion of the court, Judge Story says, that the bill of rights in Maryland, recognizes to a certain extent, the statute of Elizabeth, under which such conveyances would be upheld, although there was no specific grantee or trustee. As to which I may remark, that if the clause in the bill of rights in Maryland, which is rather an exception or recognition of the previous validity of such appropriations, (for it is found in an excepting clause to an article in the bill of rights which makes void all gifts for the support of religious teachers, or for the benefit of any religious sect or denomination) is considered as recognizing the statute of Elizabeth, there is much stronger reason for asserting that the clause in the 41st article of the constitution of this state, before referred to, not only recognizes the doctrine of charitable uses, but the law on that subject, as established by the judicial tribunals in England, and all the principles of the law, not repugnant to the constitution of this state. We are not disposed however to say, that that statute is in force here, although there is not wanting a very high authority for the position.

The case of *Beatty* vs. *Kurtz*, is considered by one of my brethren, as distinguishable from the case under consideration, on the ground that each member of the Lutheran society is to be considered as having an interest in the land conveyed. The court, however, do not lay any stress upon that circumstance, in the decision, nor was it urged in the argument.

The case of *The City of Cincinnati* vs. *The Lessee of White*, recognizes the law in relation to dedications of lands to charitable uses, which are admitted to be void, without any grantee. The subject has been fully and ably investigated in New-York, and we

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al

have the authority of the case of *The Trustees of New Rochelle,* (2 John. Chan. Rep. 292) and the opinion of Chancellor Jones, in the case of *Orphan Asylum* against *McCarter,* (9 Cowan, 440) in favor of charitable bequests, and the jurisdiction of chancery over them.

In Pennsylvania, the case of *McGirr* against *Aaron,* (1 Penn. 51) and *Witman* vs. *Lex,* (17 Sarg. & Rawle, 91) recognize the law as existing in that state. The very full and able opinion of Judge Baldwin in the circuit court in that district, on the will of Sarah Zane, where he collects and examines with great industry and ability, all the law, statute and common, with the several decisions there, which, if it is entitled to any consideration as an authority, establishes legacies, so very similar to the legacies in the will under consideration, is conclusive upon the subject.

In Massachusetts, we have the case of *Bartlett and others* vs. *King's Ex'rs,* (12 Mass. 537) where a bequest to a piou sand charitable use was sustained similar to the bequest in this will, in trust for a society similarly organized and constituted, to the societies who are the objects of Mr. Burr's bounty, the case being in no otherwise distinguished from this, except that the trustees were named.

There is also the recent case of *Emery* vs. *Gowing,* of which we have a manuscript copy, where the statute of Elizabeth is considered as in force in that state.

In Connecticut, we find a legacy to be disposed of among the brothers and sisters of the deceased, as the executors should judge most in need of the same, according to their best discretion, was held not void for uncertainty, and the executor having deceased, a committee or trustee was appointed to execute the trust.—8 Conn. 51, *Bull* vs. *Bull.*

In New Jersey, in the case of *Hendrickson* vs. *Hicks,* the doctrine of charitable uses was recognized.

In North Carolina, in the case of *Griffin* vs. *Graham,* (Hawk. 97) after a full and elaborate investigation, it was held, that the statute of Elizabeth was in force in that state. That independent of the statute, and though the jurisdiction of the court of chancery in England over charities should be considered as belonging to the court, not as a court of equity, but as administering the prerogatives of the crown, yet the court of equity in that state had the like jurisdiction ; and that where there were trustees, and a definite trust, and specific objects pointed out, the court would, as a matter

of trust, take cognizance of the same, by virtue of its ordinary ju-
risdiction, as a court of equity.

In this state, in the case of *Stone Executor of Fuller* vs. *Griffin*,
(3 Vt, Rep. 400) a church or society incorporated, was held to be
capable of receiving the use of property, devised to trustees for their
benefit.   In all these cases, it is apparent, that the courts have en-
deavored to uphold donations for public, pious, or charitable uses,
and to get over all critical, technical exceptions against them, prob-
ably thinking that they were part of the *voluntary system* adopted
in this country, for the support of pious, religious, and charitable
institutions and associations, and in which we are distinguished from
those countries where religion is sustained by force of law, and by
extensive church establishments.   The weight of authority in the
American courts, is evidently in favor of the law of charitable uses,
and the jurisdiction of courts of equity over them.

The jurisdiction exercised in these cases, is different from the
specially delegated jurisdiction which the chancellor exercises over
idiots and lunatics, and over general charities and the visitatorial
power over eleemosynary corporations, which is exercised on peti-
tion.   Where there is a general charity, as a devise to pious and
charitable uses, the king may dispose of it; and the course is, to
apply to the king by petition for a sign manual.—Ambler, 712.

A court of chancery, as such, has no jurisdiction to remove the
officers of a corporation, but where the crown become visitors for
want of an heir of the founder, and the removal of the officers is
sought, it is by petition to the great seal.   This jurisdiction is like
that exercised over idiots and lunatics by the chancellors, as the
representatives of the king.   It is a proceeding before the chancel-
lor, and not in the court of chancery, as was said by the Master of
the Rolls.—*Exparte, Dann*, 9 Vesey, 547.

The proceedings in charity cases are usually before the court of
chancery, under their general equity jurisdiction.   In the case of a
petition to the chancellor, no costs are taxed.   On bill or informa-
tion in the court of chancery, costs are allowed.   It is to be re-
membered, that this distinction has been made, that where there
is a bequest to trustees, for charitable purposes, the disposition is
made by a court of chancery, and a scheme is laid before the mas-
ter.   Here, I apprehend, the court act on their general equity ju-
risdiction.   But if no trust is interposed, and the disposition is to
charity generally, an application must be made for a sign manual;
and on this, the chancellor acts as the specially delegated officer
of the crown.

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.
It is however, somewhat immaterial here, under what head this jurisdiction is exercised; although I have no doubt it is under the general equity jurisdiction of the court of chancery, the same which is exercised over other trusts. We have all the powers incident to a court of chancery—(Stat. 123)—our rules are to be conformed to the rules and precedents established in courts of chancery in Great Britain, so far as is consistent with our constitution and laws, and we can exercise all the jurisdiction over infants, lunatics, charities, &c. which are exercised by the chancellor or the courts of chancery in Great Britain, (except that which is delegated to other tribunals,) exercising them according to our law, and not according to their statutes. Believing that the principles and elements of the law, in relation to donations to charitable uses, was known and established in England long before the statute of Elizabeth—that gifts and grants may be made for purposes of relief to the poor, and for upholding charitable purposes, having in view the moral, intellectual, and religious improvement of the objects which are from necessity general, uncertain and indefinite—that communities and associations might be united for the purpose of receiving these donations and distributing them—that they are within the jurisdiction of a court of equity, which by its constitution and rules, is alone adapted to carry them into effect; and believing also, that the law, which has been built and established by a series of doctrines, as well as the jurisdiction, does not necessarily arise, or grow out of that statute. We believe that many, if not most of the decisions, in cases which have been before the court of chancery, are applicable to this country, and are authorities here. Nothing further will be necessary than to compare the legacies given in this will with those which have been established as valid by decided cases, and from them learn whether they are such as can and ought to be carried into effect, in the exercise of our equity jurisdiction. How many of the cases which have been decided on the doctrine of Cypres, are incompatible with our free institutions, it is not necessary here to inquire or decide. One thing however may be confidently affirmed, there are no reasons of state, no considerations arising from an established religion, requiring us to refuse to carry into effect a bequest to a charitable use, lest it should tend to propagate a false religion.

The decision in the case of *The King* vs. *Lady Perlington*, (1 Salk. 162—3 do. 34) would not be considered as compatible with our free and liberal ideas on the subject of religion. A Jew might here give his property for building a synagogue, and we should not

appropriate it to building a foundling hospital, (Amb. 228). We
should be loath to decide, that a devise for bringing up poor children
in the Roman Catholic faith, was void ; and yet declare that it
should go to such uses as others might direct, (7 Vesey, 490).
But when we do find a charitable intent, and property given for
any public, pious, and charitable use, tolerated among us, and we
can carry it into effect in the exercise of our equitable jurisdiction,
as a court of chancery, we ought to do it ; and more especially, we
should hesitate about giving the property, left by a testator, to those
who were not considered by him as in any way entitled to it, and
disappoint his pious and charitable intention, which probably afford-
ed him a consolation in his departing hours.

On examining the authorities upon this subject, some of the ca-
ses will be found directly applicable to the case under considera-
tion, and embracing almost every point raised in the argument.—
These general principles have been established, which seem to rise
necessarily from the nature of the subject,—that the court are to be
liberal in the construction of charitable bequests, to carry into effect
the intention of the testator,—that where they can discover the
charitable intent, they will carry it into execution, and support the
charitable purpose,—that they will not suffer an equitable interest
to fail for want of a trustee to support it ; and that it has never
been considered as an objection to a charitable use, because it was
general and in some measure indefinite, unless there was an uncer-
tainty as to the amount intended to be given, or the general pur-
pose was of so uncertain and indefinite a character, that it could not
be executed : the instances of which, will be mentioned.

In the case of the *Attorney General* vs. *Clark*, (Ambler, 422)
a legacy to the poor inhabitants of St. Leonard's Shoreditch was
sustained, although there were no trustees or persons to select the
objects named in the will. In this case, a reference was made to
the case of the *Attorney General* vs. *Rance*, where a legacy was
given to the poor, without designating what poor. As the testator
was a French refugee, it was given to the poor refugees. Similar
to this was the case of *Power* vs. *Attorney General*, (3 Mer. 48)
where a bequest to the widows and seamen of the town of Liver-
pool was sustained.

A bequest to the widows and orphans of the parish of Linfield
was objected to, for that the description of the persons was too gen-
eral and uncertain. It was held good as a gift to the *poor* widows,
&c.—*Att'y Gen.* vs. *Comber*, 2 Simons & Stuart, 93.

In the case of the *Attorney General* vs. *Hickman*, (2 Eq. Cas.

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

Abr. 193) the persons who were to relieve the objects of the char-ity deceased in the life-time of the testator, and yet the legacy was sustained. The use declared, was for the encouragement of such nonconforming ministers as should preach God's word in places where the people were not able to allow them a sufficient mainte-nance. The testator left the disposition of this charity to persons who died in his life-time. The Chancellor Lord King, said the charity which was the substance of the devise, remained, notwith-standing the death of the trustees, and could be administered by the court, as well as if the legatee was alive.

The case of *Waller* vs. *Childs*, (Ambler, 524) is very similar to the present. This was a bill brought by the heir at law, against the executors and trustees, to set aside the charitable bequests.— The directions in the will were to pay to the *treasurer or treasur-ers, for the time being,* of a society or fund, for the maintenance and bringing up of dissenting students for the ministry of the gospel. It appears there were three denominations, viz. the Presbyterians, Independents, and Baptists—each of which had a society, consist-ing of persons chosen out of their congregations, called the mana-gers of the fund, for the support of pious dissenting ministers of their denominations;—that collections were annually taken up and put into the hands of the treasurers thereof, for the time being.— This bequest was objected to as void for uncertainty. The court decided in favor of the charity, and ordered the money to be paid to all the treasurers of these denominations, upon the trusts in the will. This case, unless it was founded on the statute of Elizabeth alone, certainly covers the whole ground contended for by the dif-ferent societies in this case.

The case of the *Attorney General* vs. *Stepney,* (10 Vesey, 22) where a bequest to the Welsh Circulating Charity School for the increase of Christian knowledge, and promoting religion, and to purchase Bibles and other religious books, pamphlets and tracts, as the trustees should devise, was held to be a good bequest, sub-ject however to such checks as might be consistent with the reli-gious establishment of the kingdom, but which would not be requi-red in this country.

These cases are a very few, selected out of a great multitude, to show that the remarks of Godolphin and Swinburn, made long since, " that testaments to pious uses are not void in respect of un-certainty, as other testaments are," is still recognized as the law upon that subject. The cases where legacies have failed for un-certainty, either as to the amount intended to be given, or of the

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

uncertain and indefinite purpose of the charity, are none of them similar to those under consideration.

In the case of *Brown* vs. *Yeale*, (7 Vesey, 50) the bequest was for the purchase of such books as may have a tendency to promote the interest of virtue and religion, and happiness of mankind; and was determined to be too indefinite to be executed by the court.— The correctness of the application of the principle to that case, was however doubted by Sir William Grant and Lord Eldon, (9 Vesey, 399). A bequest "for such objects of benevolence or liberality as the Bishop should appoint," (9 Ves. 399) "for such benevolent purposes as the executors might agree on," (3 Mer. 7)—a bequest for such charitable or public uses, or to any person or persons, as the trustees might direct, (1 Simons & Stuart, 69) were held void, as uncertain and indefinite. In all these cases, there were no specific objects or purposes of charity—no charitable purposes designated; and as they were general and indefinite, and could not be executed, the legacies failed for uncertainty.

The distribution of charitable donations, it appears also, may be made by persons unincorporated, and who are shifting from time to time.—*Baylis and Church* vs. *Attorney General,* 2 Atk. 239.— The Lord Chancellor observed, that though the Alderman and Inhabitants are not in point of law a corporation, yet as the Attorney General was a party, he made a decree that the money should be disposed of as the Alderman, for the time being, and the principal inhabitants should think most beneficial.

In the application of the principles of the law, and these various decisions, which are selected from a great number, (for the subject and the authorities have been fully and ably sifted in several cases within a few years previous to the case before us) we shall find, that the legacies in the will of Mr. Burr are established beyond all controversy, if these decisions are to be recognized as authorities upon this subject in our courts. These different societies have been long known, united and associated, precisely the same as similar societies have for a long time existed for similar purposes;—not incorporated, because they are better adapted to the ends of their associations, without an act of incorporation. The objects of their association are defined and certain, and the members are generally those who contribute their funds to, and are from sentiment and duty friendly to the objects of their association. The purposes are such as have been considered as charitable by the decisions of courts of chancery and law, and have been recognized as such both before and after the statute of Elizabeth, and are more definite than

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

many enumerated in Porter's case, for which lands, tenements, and hereditaments may be given, and much more so than a great portion of those which have been adjudged to be good charitable uses from the time of Edward I. to the present time. The funds are usually expended under the direction of a board of managers or directors. The due administration of them can be enforced, and the maladministration prevented or punished in a court of chancery.— If the objects of the society are such, for which money may be lawfully given, what better way could be devised to promote that object than to employ these societies, already organized and in operation, for that very purpose ? If a scheme was to be submitted by a master to carry into effect the objects intended by this will, I can think of none so good as to direct the legacies to be paid to the societies already in existence. The testator having constituted these societies, or their managers and directors the almoners of his bounty, to expend the legacies for the objects contemplated in ther association, this court can decree the money to the amount of the legacies to be paid them, either on the application of the state's attorney, or on the application of any of the members of the societies, in behalf of themselves and their associates. If it was a perpetual fund, the annual income of which alone was to be appropriated, the court would find some way to perpetuate the fund, and apply the income. The societies in this case, are to receive and distribute the legacies, according to the intention of the testator, for the purposes of their association. They receive nothing for their own benefit or their own individual use. The individual persons, who are to be ultimately benefited, are of course undefined and unknown. The managers of the Bible Society, of the Domestic Missionary Society, the Colonization Society, and the Tract Society, are sufficiently described, according to the case of *Bartlett* vs. *King*, (12 Mass:) and the objects as fully pointed out as in the case of *Attorney General* vs. *Stepney*, (10 Vesey) or *Attorney General* vs. *Comber*. They are competent to expend this property, which is not given as a perpetual fund, but for immediate distribution, responsible both in conscience and law for their fidelity in executing their trust.

Having the view already expressed, of the law, of the jurisdiction of the court, and the nature of these legacies, we must of course come to the conclusion, that if there was a devise of real estate, directly to these societies, or the annual income of the estate was devised to them, we should decree a sale, if necessary, and the proceeds paid over, or substitute a trustee to support the fee. It be-

ing however a devise of money not for the purpose of a perpetual
fund, I can see no objection in decreeing the money to be paid to
the one who ordinarily receives and keeps the funds of these socie-
ties, or to the treasurer for the time being, whoever he may be, as
was done in the case of *Waller* vs. *Child*.   But inasmuch as the
testator has directed that the legacies should be paid to the treas-
urers of the societies for the time being, whose receipts are to be
a sufficient discharge, the court have considered that whoever was
designated to that office or appointment, on the death of the testa-
tor, is the person or trustee to whom the legacies are to be paid,
and who is capable of receiving the legacies as they become due,
for the use and benefit of these societies, to be disposed of by them
for the objects contemplated in their associations, agreeable to the
intent of the testator, and the solicitor may draw a decree agreeable
to the minutes herewith furnished.

In this result, I am authorized to say, that a majority of the court
concur.

MATTOCKS, Chancellor, *dissenting.*—The amount of property
involved in this case has elicited much industry in the preparation
and great talent in the argument.   The case has been several times
argued, but the court have never been so fortunate as to come near
unanimity ; and upon its decision, the minority not being a solitary
individual, it relieves me, as I agree with the learned judge who
has dissented, from going into the case in detail, which indeed,
from the great learning which the counsel have displayed, would
be quite above my ability.   Yet the importance of the question,
and the fear that the precedent may lead to dangerous consequen-
ces, and having left the court before the decision was pronounced,
induces me to record some of the reasons of my dissent, without
pretending to discuss the whole subject.   For it may happen that
a judge as well as a juror may feel that it is his duty to resist the
conclusion which has been ingeniously urged upon him, without
having learning enough to detect all the errors in the process.

Among the points presented in writing by one of the able coun-
sel for the societies, at the last term, were the following.

" 9th. In the case of a charitable use, like other trusts, there
must be a legal estate to support it.

" 10th. The testator has vested the legal estate in these money
legacies in question, subject to the charitable use, in the treasurer
for the time being, viz : the time when the legacy is to vest."

The ninth proposition, although it has not, I believe, been re-

BENNINGTON,
*February,*
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

CASES IN THE SUPREME COURT

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
peated by the gentleman this term, I regard as the frank admission of a good lawyer, made from a conviction that it was undeniable, and which satisfied me of its truth.

The tenth being an adverse proposition, required to be proved; and if that is made out, the generous advocate has lost nothing by the ninth. On this tenth point, in my view, hangs all the law and the equity that should govern the case; for if the property was vested in the societies, or their treasurers, it should be decreed to them, and if necessary, they should be protected in the enjoyment of it, by expending it in works of piety and charity, according to the benevolent intentions of the associations. If not, the residuary legatees are fairly entitled to it for their benefit, according to the undisputed powers of the court of chancery relating to legacies and trusts.

I am satisfied, from the arguments and authorities cited, that no legal estate passed by will to the societies or the treasurers, nor any individuals who have been or will be treasurers; and as I understand that to be the opinion of a majority of the court, I am not a dissentient on this point, and therefore it is not my province to state the grounds of this opinion.

The arguments that are the most strongly urged at this term are, that it is within the power and is the duty of this court, as a court of chancery, to sustain these bequests as appointments to pious and charitable uses, if they are not supported by the law;—that we are warranted in doing this by the civil law as adopted by the English courts of chancery before the statute of Elizabeth, or at all events after;—and that the spirit of the statute has descended to us, and if absolutely necessary, the statute itself.

Lord Mansfield, it has been said, would resort to the civil law when straightened. The Roman law, in its day, was wise and potent; but when the numerous popish clergy who followed William the conqueror, and engrossed all the offices in the realm, being ignorant of the laws of England, introduced the civil law, and intermixed it with their own canon law, it was seen to be favorable only to the monkish clergy, who were delighted with it, but it was universally resisted by the nobility and laity. But the pope, with his enthroned archbishops and installed bishops, was an overmatch for the nation, and in the fourth reign from the conquest, fastened these laws upon them, together with an appeal to the court of Rome, as a part of the common law; and it is remarkable that at the reformation, in lieu of abolishing the canon law, the statute of 25 Henry VIII. established it when not repugnant to the law

BENNINGTON,
*February*,
1835.

Ex'rs of Burr
*vs.*
Smith *et al.*

of the land or the king's prerogative, until a new canon law should be made, which not being done by the 1st Elizabeth, that statute was revived and confirmed; and there having been no canon law of the land before the popish, and none having been substituted since the reformation, it seems the protestant episcopal church in England is still governed by the canons of the mother church.   But the civil law, save such part as has become canon, has not been established by act of parliament, and if it had, with the same exceptions, ("when not repugnant to the law of the land,") would not affect the construction of wills, upon which the common law is not silent, and to the courts of which the chancellor himself often resorts for aid.   The civil law, as such, has no force in England, except from usage in some particular cases, and in some particular courts, where they have adopted the civil law doctrine of charities.   Roberts on Fraud, 353, in note 125, says, "By the civil, and more particularly by the canon law, certain preferences and indulgencies were allowed to the *testamenta ad pias causas*.   But it does not appear that our law makes any distinction in favor of a will for the benefit of a charity.   Thus if a devise be made to A and his heirs, and if A die without heirs, to a charity, such devise over is void, as it would be in case of common persons; and no favorable construction will take place to give effect to such devise over, such as would be made, if it were to a person related in blood, so as to be capable of becoming the heir at law, from an implication of intention, founded upon the impossibility that the first devisee should die without heirs, while the ulterior devisee was living, by restricting the sense of the word 'heirs' to heirs of the body."   He cites Cro. Car. 57, *The Attorney General* vs. *Gill.*   This last case was an information by the attorney general to establish a charity, and the lord chancellor said—"As to what is said, that the devise of the remainder ought to be supported as given to a charity, supposing it void if given to a common person, so shall it be also when given to a charity;" and adds, that "heirs" shall not be construed to mean heirs of the body, where the devise over is not inheritable, and quotes many authorities; thus making blood a greater favorite of the law than charity even.

The same note adds, " and on a deficiency of assets, legacies to a charity will abate in proportion of others," and cites two cases 1 P. Wms. and adds, "But nevertheless, our courts of law or equity will not enjoin the spiritual court from proceeding in lega-

40

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.
tory matters according to the civil law.—*Fielding* vs. *Bond*, 1 Vern. 230." In *Masters* vs. *Masters*, 1 P. Wms. 422, the master of the rolls says, " that the charities, though preferred by the civil law, ought to abate in proportion, for they were but legacies." In *Attorney General* vs. *Hudson*, the lord chancellor said that all the legacies, as well to charities as others, should abate in proportion, for though the Roman law preferred a pious or charitable legacy to others, ours does not; and in a note it is said, " But the spiritual court give a preference to charity legacies, and lord North would not enjoin them." This shows that there is yet a conflict of laws in the different courts as to charitable uses; and this single note is some evidence to my mind, that the general understanding of the profession there is, that the common law will not violate its own settled principles in favor of a charity which may not always be just; for what a charity gains, some one or more must lose; and it is not because our ancestors thought less of piety and charity, but because they respected more the certain and sure tenure of property and the tranquil succession of the offspring to that of their ancestors, that they guarded more against the caprice of testators.

Much creditable research and acumen have been shown in endeavoring to make out that the courts of chancery, by their common and ordinary jurisdiction, independent of the statute of Elizabeth and of the prerogative, have sustained defective, and at law, void bequests to charities, &c. Duke on Charitable Uses, with the readings of Sir Francis Moore upon the statute of charitable uses, which it is said to be suspected had escaped the attention of the supreme court of the United States and of lord Loughborough, and which is so rare in America that its only fellow is in the library of some (I suppose inaccessible) antiquarian society, has been imported for the occasion. As great judges and chancellors have differed on this topic, it was a fit subject of forensic criticism, but to me it appears, that if there has been some few such decisions, they were made by confounding the civil and canon law, the previous statutes, and the prerogative together, with the superstitions of the times, and has become as obsolete as the book which contains them, and which, it seems, is not known at the capital and scarcely at Westminster Hall, and should now be regarded rather as buoys to deter than beacons to invite. Many of the cases in Duke show that wretched work was made with charitable uses, some, if not all, under the statute. A few will be transcribed as a specimen. Page 386—" A wife having power to dispose of her personal estate, which only comprehended what she had before

BENNINGTON,
February,
1835.
Ex'rs of Burr
vs.
Smith et al.

marriage, got afterwards into the possession of a large personal es-
tate, in a private manner, upon the death of her father, and con-
cealing the same from her husband, disposed thereof to charities.
Held that what was so concealed from the husband shall not be
made good to him, so as to disappoint the charities." Page 390—
" A devise to trustees for the benefit of a charity, the trustees died
in the life-time of the testator, though it be a lapsed legacy in law,
it is subsisting in equity." Page 401—Lord Hardwick says, " This
is a different kind of charity from those pretended ones in the times
of popery and monkery." Page 360—" An inscription on the
donor's tomb-stone, declaring the donor's gift to a charitable use,
was found in *hæc verba*, and a decree thereupon accordingly, and
is a very good precedent." This inscription was the posthumous
offspring by another father. Sir Francis Moore's readings, Duke,
p. 128—" It was decided, that, in case of will by a popish recu-
sant to students in divinity did not mean poor priests, for that was
no charity, but superstition." Page 124—" Religion being varia-
ble, according to the pleasure of succeeding princes, that which at
one time is held for orthodoxy, may at another be accounted super-
stitious, and then such lands are confiscated. Therefore, a gift of
lands to maintain a chaplain or minister, to celebrate divine service,
is neither within the letter nor spirit of the statute Elizabeth." Page
125—" To find bows and arrows for poor children of a poor man
is good, because it is an ease to the fathers who are bound to find
them." And to complete the list of unjust and ridiculous decis-
ions, it was gravely adjudged. It is said, though it is not in Duke,
that where an Israelite left money to build a synagogue, that was
superstitious; but as the Jew evidently had a charitable intent,
the money should be laid out to build a lying-in hospital. Shall
we now assume the power that was there exercised, whether it was
ordinary or extraordinary—whether it was the spirit of the statute
of charitable uses, or the domination of the clergy, who had acqui-
red much of the landed property of the kingdom, and the bishop
being the orphan's court, denied their right to personal property,
and gave it to strangers in charity at pleasure, until the statute of
distributions, or any other cause which occasioned these odious de-
cisions ? I think not, so far as I know, until this case arose, no one
in this state ever dreamed of such a chancery power.

As to the statute of Elizabeth being in force here, that has lat-
terly, with great discussion, been abandoned in the argument. The
41st section of the constitution of Vermont, has been urged as au-
thorizing the court to extend the protection claimed to these socie-

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

ties. But the latter clause, which says, "under such regulation as the general assembly of this state shall direct," evidently gives this power to that body. They can enact a statute of charitable uses, in addition to what they have done for them. Granting the power to them, is not granting it to us; but is virtually saying, if it means this protection, that we have it not, and is in favor of the other side, who have also quoted it. If it means other protection and encouragement, it has nothing to do with this case. It is also contended that the statute of Elizabeth, or the spirit of it, has been introduced into most of the states : In some of the old states, it has been so considered, it seems.

The Pennsylvania case, reported in the pamphlet produced, in which Judge Baldwin displays so much learning, was decided on the ground that the Quaker societies " must be considered as a body politic or corporate by presumption—as possessing and enjoying the right of succession, with the same rights of property, as natural persons do by inheritance." That aided the cause. The balance of the opinion is what has been called *sloping over*.

In New-York, Chancellor Kent says, it was unsettled when he wrote; notwithstanding Chancellor Jones' opinion, I do not understand that the glebe rights in Vermont are held upon any chancery or charitable use principle, but upon the common principles of grants—the fee to vest in the Parson, when inducted like one. And the New-Hampshire grants to the first settled minister, like a devise to the future children of A." But if it were so, the decision of the supreme court of the United States, in which this state, by granting away these lands to common schools, had made itself a party, would hardly be adopted as the local common law. But after all, suppose it were granted that all the English courts of chancery have and do consider that the system of churches is established, and that by these ordinary powers, they can support bequests defective at law, is it applicable to our government and community ? Is it called for by the wants of religion, virtue, or literature ? For upon the question of making a precedent, and not following one already made, these are proper enquiries.

In England, for many centuries, bequests to corporations and to pious and charitable uses, by various acts of parliament and decisions of the courts, have been alternately encouraged and discouraged, as different notions prevailed, until the laws and usages had become very much involved : when, by the 9th of Geo. II., the final mortmain act was passed, which did not, like Henry VIII., seize upon the property of the church, or the charities; but effec-

tually guarded against all death-bed importunities, as to worldly
matters, and perhaps was intended among other things to remind
opulent persons that deeds of charity, like the work of repentance,
should not be put off to the last. This act has now existed for an
hundred years, save one. Some part of it, at least, of enlightened
jurisprudence and of vital piety, has been commended by many
wise men, and condemned by none, so far as I know. And the
present century, so far as christian benevolence can be shown by
not withholding the sinews of its warfare, has been a time of un-
paralleled generosity. For the Protestants of that realm have
poured out their money for pious uses, as freely as the martyrs of
old did their blood; and to their example we are probably indebted
for much of the same spirit, which has been manifested in this
country. And shall we now introduce a system here, which has
been exploded there without any apparent injury, and which prob-
ably has produced great benefits? I do not mean to intimate that
a mortmain act is required in this state. Our early marriages, and
the love of progeny, of which most men have sufficient, and the
general prudence and discretion of ministers and other pious men,
during last sicknesses, have prevented, and is sufficient to prevent
the danger of improper influences. And on the other hand, the
simplicity and ease of making valid bequests to charity, which is
generally less difficult than disposing legally, as is intended, of an
estate, among a large family, requires no special indulgence for
carelessness or mistakes. But let it remain as it has remained;
and let him who deems it duty to leave his property to the public
in lieu of his relatives, take the trouble to see that he does it ac-
cording to law: For if he has well considered the subject, he has
time and opportunity to do so : And if it is a sudden thought that
suggests itself, or that is suggested to him at too late a period to do
this, its propriety may be dubious, and let his property take the
course of nature, which generally will do very well. But a strong
objection in my mind against assuming the power, is the great dif-
ficulty in deciding what shall be a charitable use. In many cases
like the present, there could be no doubt; but in others less clear,
there would be many doubts. In the list collected by Judge Bald-
win, in Sarah Zane's case, of statute and adjudged cases, to be
valid on as pious and charitable, before the statute of 43d Elizabeth,
is forty-six ; and those embraced by the statute, twenty-one.—
These include various public matters that would not at this day and
in this country be called pious or charitable, but rather strict legal
duties, if any, as "cleaning the streets," "the maintenance of

BENNINGTON,
February,
1835.

Ex'rs of Burr
vs.
Smith et al.

pier-walls and sea-banks," "maintaining the poor in houses of correction," "for repairing roads and bridges," "fitting eut soldiers' and other taxes." In applying these statutes or decisions, or the spirit of them, as we are urged to do, it would be necessary either to consider charitable uses to extend to every use that is not private, or it will devolve on the court to decide what objects should be considered as pious or charitable; for it is evident that the courts of England have not considered, like *Domat*, that "since legacies for works of piety and charity have a double favor, both that of their motive for holy and pious purposes, and that of their utility for the public good, they are considered as being privileged in the intentions of the law." For the public objects which I have quoted, stand upon the same footing as those that are public and pious, such as "the endowment of a vicar to inform the people;" and it would not be contended, it is supposed, that a bequest to a railroad or steamboat, would be to a pious or charitable use, so as to entitle it to more favor than a legacy to a child, or other relation. Of course the court of chancery here must without the aid of the statute of Elizabeth, as to designating the objects, beyond the letter or spirit of which, the English chancellors, since its passage, have never extended their charitable construction, and to that extent, with regret, decided what are objects of piety and charity, that ought to be favored and treated with more benignity in equity, than they are viewed in the austere courts of the law.

And Sir Francis Moore has said, that religion is variable according to the pleasure of succeeding princes. It might happen, that piety and charity, about the modes and forms of which good men disagree, would vary with succeeding chancellors, and with the excitement and fluctuations of the times and topics that engage the attention of the public. The difficulties are not the common ones which all courts have to encounter, of distinguishing cases, and applying some known rule nr principle to the one in hand; or if the case is new, the best analogous principle, and which there is sometimes perplexity in doing, but can generally be effected with tolerable correctness; because most honest men are agreed, in the main, about what is just. But the difficulty in the cases in question is intrinsic; for all things that are lawful, are not commendable; and what is commendable at one time, is not at another, from mere change of public sentiment. Only twenty years ago, a distiller was deemed a useful citizen;—he promoted home manufactures, which tended to make us independent of other nations.— Now he is a man-slayer, because he makes liquid poison. Yet

the business is as lawful now as then ; and upon a question of right, would be as well protected ; but upon a question of favor, it would be otherwise. There has been no such change of opinion as to fraud, accidents and trusts, always the proper subjects of chancery.

But suppose we were now to make a list of uses that are to be especially protected, and therefore encouraged as bequests to pious and charitable uses, or which may be the same test, suppose any or all the societies of this and the neighboring states should claim to have a defective bequest, supported under favor—to say nothing of masonic societies, as that question has become political—how would it be with colonization and anti-slavery societies, which regard themselves as the antipodes to each other ? are they both commendable ? and if not, are we to say which, if either is ? Or suppose an endowment of a free school for blacks in the state should, or should not be favored ; or the establishment of a Shaking Quaker station, or to the Mormons, or to establish a Jesuit College, or a Nunnery, or a Synagogue : These are all lawful, and equally protected, with other religious and charitable societies, by the constitution and the laws, and would receive equal justice at our hands. But in the matter of favor, as being pious and charitable uses, to say "*no*" to any of them, would be invidious—to say "*yes*" to them all, would be a tremendous stretch to the conscience of an orthodox chancellor. Nothing but the express warrant of the legislature would induce me to handle these exciting questions, some of which there is already danger may affect the tranquility of the nation. And to assume or to use the undefined and undefinable judicial discretion, which has been urged upon us, will compel us or our successors to entertain these and other similar questions whenever they arise.

Finally, although I most cordially approve of the objects of all these societies, having been for a long time an unworthy member of some of them, or their branches, and happen to be of the same faith with the testator, and of the religious societies that he intended so liberally to patronize. Yet I cannot but believe, with due submission, that the cause should have been decided the other way.